IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ROSA CARMINA RODRIGUEZ, ALEXIS E. AGOSTINI, RAYMOND U. ARROYO, CARL C. CHRISTENSEN, ERNESTO L. CRUZ, MANUEL Q. CRUZ, SHIRLEY Y. M. CUMMINS, LINDA T. KUAILANI, ROY LYNCH, RAFAEL A. MARTINEZ, ALBERT E. MILLER, JULIA Q. NORMAN, HILDAMAR ORTIZ, REGINALD KENALIO PUANA, IVAN O. PUIG, CYNTHIA JEAN ROMNEY, VICTOR L. ROSARIO, CELIA A. RUIZ, and JOEL A. TUTEIN; <br><br> for themselves, and on behalf of all persons similarly situated, <br><br>     Plaintiffs, <br><br>        v. <br><br> The UNITED STATES OF AMERICA, the U.S. OFFICE OF PERSONNEL MANAGEMENT, and KATHERINE ARCHULETA, Director of the U.S. Office of Personnel Management, <br><br>     Defendants. | Case No. _____ <br><br> CLASS ACTION COMPLAINT <br><br> AND DEMAND FOR JURY TRIAL |

## **CLASS ACTION COMPLAINT**

TO THE HONORABLE COURT:

    Plaintiffs, by and through their undersigned counsel, on behalf of themselves and all others similarly situated, state and allege as follows:

## PARTIES

### Plaintiffs

1.      Plaintiffs, and all other members of the class defined below, (a) are, were, or will be employed by the United States, or by its agencies, instrumentalities, and corporations, in one or more of the following areas: Puerto Rico, the U.S. Virgin Islands, Guam, the Northern Mariana Islands, Hawaii, and Alaska (called "COLA areas"), or (b) are, were, or will be a surviving spouse of such an employee.  The COLA areas are among the "non-foreign areas" of the United States.  All class members in group (a) receive or received a cost-of-living allowance ("COLA") pursuant to Executive Order 10000 and applicable statutes and regulations.  Plaintiffs bring this action for themselves and on behalf of all past, present, and future federal employees in COLA areas and the surviving spouses of such employees.

2.      Rosa Carmina Rodriguez is a citizen of the United States and a resident of Puerto Rico.  She is employed by the United States Department of Housing and Urban Development in San Juan, Puerto Rico.  She is Hispanic and African-American and has experienced continuing losses as a result of the unlawful and discriminatory practices of The United States Office of Personnel Management ("OPM").  She also will incur further losses, in terms of her annuity payments, after she retires.

3.      Alexis E. Agostini is a citizen of the United States and a resident of Puerto Rico.  He was formerly employed by the United States Department of Agriculture in Puerto Rico.  He is Hispanic and has experienced losses as a result of OPM's unlawful and discriminatory practices.  He is retired and has incurred continuing further losses in terms of his annuity payments.

- 2 -

4.     Raymond U. Arroyo is a citizen of the United States and a resident of Guam.  He was employed by the United States Department of the Navy in Guam.  He is Hispanic and a Pacific Islander (Chamorro) and has experienced losses as a result of OPM's unlawful and discriminatory practices.  He is retired and has incurred continuing further losses in terms of his annuity payments.

5.     Carl C. Christensen is a citizen of the United States and a resident of the U.S. Virgin Islands.  He is employed by the U.S. Small Business Administration in the U.S. Virgin Islands.  He is African-American and has experienced continuing losses as a result of OPM's unlawful and discriminatory practices.  He also will incur further losses, in terms of his annuity payments, after he retires.

6.     Ernesto L. Cruz is a citizen of the United States and a resident of Puerto Rico.  He is employed by the United States Department of Housing and Urban Development in San Juan, Puerto Rico.  He is Hispanic and has experienced continuing losses as a result of OPM's unlawful and discriminatory practices.  He will also incur further losses, in terms of his annuity payments, after he retires.

7.     Manuel Q. Cruz is a citizen of the United States and a resident of Guam. He was employed by the United States Department of the Navy in Guam.  He is Hispanic and a Pacific Islander (Chamorro) and has experienced losses as a result of OPM's unlawful and discriminatory practices.  He is retired and has incurred continuing further losses in terms of his annuity payments.

8.     Shirley Y.M. Cummins is a citizen of the United States and a resident of Hawaii.  She was employed by the United States Department of the Navy in Hawaii. She is Asian and has experienced losses as a result of OPM's unlawful and

discriminatory practices.  She is retired and has incurred continuing further losses in terms of her annuity payments.

9.      Linda T. Kuailani is the surviving spouse of Francis Kuailani Sr.  Francis was employed by the Department of the Interior in Hawaii and retired before his death. Francis was Native Hawaiian and experienced losses as a result of OPM's unlawful and discriminatory practices.  OPM's unlawful and discriminatory practices continue to impose losses upon his surviving spouse, Linda.  Linda is Asian.

10.     Roy Lynch is a citizen of the United States and a former resident of the U.S. Virgin Islands.  He was employed by the United States District Courts in the U.S. Virgin Islands.  He is African-American and has experienced losses as a result of OPM's unlawful and discriminatory practices.  He is retired and has incurred continuing further losses in terms of his annuity payments.

11.     Rafael A. Martinez is a citizen of the United States and a resident of Puerto Rico.  He was employed by the United States Bureau of Alcohol, Tobacco, Firearms and Explosives in Puerto Rico.  He is Hispanic and has experienced losses as a result of OPM's unlawful and discriminatory practices.  He is retired and has incurred continuing further losses in terms of his annuity payments.

12.     Albert E. Miller is a citizen of the United States and a resident of Hawaii. He is employed by the Federal Aviation Administration in Hawaii.  He is a Pacific Islander (Native Hawaiian) and has experienced continuing losses as a result of OPM's unlawful and discriminatory practices.  He also will incur further losses, in terms of his annuity payments, after he retires.

- 4 -

13.    Julia Q. Norman is a citizen of the United States and a resident of Guam. She is employed by the United States Department of the Navy in Guam. She is a Pacific Islander (Chamorro) and has experienced continuing losses as a result of OPM's unlawful and discriminatory practices. She also will incur further losses, in terms of her annuity payments, after she retires.

14.    Hildamar Ortiz is a citizen of the United States and a resident of Puerto Rico. She is employed by the United States Department of Housing and Urban Development in San Juan, Puerto Rico. She is Hispanic and has experienced continuing losses as a result of OPM's unlawful and discriminatory practices. She also will incur further losses, in terms of her annuity payments, after she retires.

15.    Reginald Kenalio Puana is a citizen of the United States and a resident of Hawaii. He was employed by the United States Department of the Navy in Hawaii. He is a Pacific Islander (Native Hawaiian) and has experienced losses as a result of OPM's unlawful and discriminatory practices. He is retired and has incurred continuing further losses in terms of his annuity payments.

16.    Ivan O. Puig is a citizen of the United States and a resident of Puerto Rico. He was employed by the United States Postal Service in Puerto Rico. He is Hispanic and has experienced losses as a result of OPM's unlawful and discriminatory practices. He is retired and has incurred continuing further losses in terms of his annuity payments.

17.    Cynthia Jean Romney is a citizen of the United States and a resident of the U.S. Virgin Islands. She was employed by the United States District Courts in the U.S. Virgin Islands. She is African-American and has experienced losses as a result of

OPM's unlawful and discriminatory practices.  She is retired and has incurred continuing further losses in terms of her annuity payments.

18.     Victor L. Rosario is a citizen of the United States and a resident of Puerto Rico.  He was employed by the United States Office of Personal Management in Puerto Rico.  He is Hispanic and has experienced losses as a result of OPM's unlawful and discriminatory practices.  He is retired and has incurred continuing further losses in terms of his annuity payments.

19.     Celia A. Ruiz is a citizen of the United States and a resident of Puerto Rico.  She was employed by the United States Department of Housing and Urban Development in San Juan, Puerto Rico.  She is Hispanic and has experienced losses as a result of OPM's unlawful and discriminatory practices.  She is retired and has incurred continuing further losses in terms of her annuity payments.

20.     Joel A. Tutein is a citizen of the United States and a resident of the U.S. Virgin Islands. He is employed by the United States National Park Service in the U.S. Virgin Islands. He is African-American and has experienced continuing losses as a result of OPM's unlawful and discriminatory practices.  He also will incur further losses, in terms of his annuity payments, after he retires.

**Defendants**

21.     In this complaint, the term "United States" refers to the employer of all class members in group (a) and, depending on context, to the geographical area comprised of the non-foreign areas (as defined in 5 C.F.R. § 591.205) and the contiguous 48 states.  The Office of Personnel Management, or OPM, is an agency of the United States, of which Defendant Katherine Archuleta is Director, and is

responsible for calculating and paying annuities to retired federal employees, providing other employment benefits, setting COLA rates, and administering other civil service programs, all in accordance with applicable laws.  As used hereafter in this Complaint, "Agency" refers to either OPM or its predecessor, the Civil Service Commission, as the context dictates.  The United States, the Agency, and Director Archuleta are collectively referred to as "Defendants."

## SUMMARY OF THE CASE

### Annuity Claims

22.    Defendant OPM has unlawfully excluded COLA from measures of "basic pay" and "base pay" used for calculating the federal retirement annuity, federal life insurance benefits, and contributions to the Thrift Savings Plan.  (Such measures are sometimes called the "retirement base.")  This exclusionary rule consists of practices and regulations that are contrary to the intent of Congress and the President and beyond the authority of the Agency.  In addition, the rule has been followed without explanation or opportunity for comment, has no rational basis, and is arbitrary and capricious.  Further, the rule discriminates against protected minorities, in violation of 42 U.S.C. § 2000e-16 and 5 U.S.C. § 2302(b), and it violates the legal mandate of equal pay for equal work throughout the federal workforce.  For each of these alternative reasons, the rule excluding COLA from the retirement base is null and void.

23.    Today, federal employees in COLA areas are the only class of federal employees in the United States whose regular compensation for normal working hours in their place of permanent residence is discounted in the calculation of their retirement annuities, *i.e.* that is not entirely included in the retirement base.  On the other hand, the

costs of living in COLA areas are the highest in the nation.  Considering both sides of the picture, *i.e.* lower annuity payments combined with higher living costs, federal retirees in non-foreign areas are enduring extreme hardships during the last years of their lives.  These hardships are not faced by federal retirees anywhere else in the United States.

24.     The Non-Foreign Area Retirement Equity Assurance Act of 2009, Pub. L. 111-84, div. A, title XIX, subtitle B (Sec. 1911 *et seq.*), 123 Stat. 2619 (Oct. 28, 2009 ) ("Non Foreign AREA Act of 2009" or "2009 Act") provided no relief to pre-2010 retirees. For post-2009 retirees, the 2009 Act reduced, but did not eliminate, the disparity between their retirement annuities and the annuities that will be received by federal employees performing the same work in the contiguous United States.  Moreover, the partial relief provided to post-2009 retirees is offset by ongoing salary discrimination against all federal employees in non-foreign areas, including (but not limited to) new forms of discrimination in locality pay methodology.

### Salary Claims

25.     The proportionality between federal salary levels and local living costs that exists for the benefit and protection of all federal employees in and across the contiguous United States does not extend to COLA areas.  There, federal salaries are lower and living costs are higher, compared with the 48 contiguous states and the District of Columbia, as the result of acts and omissions of OPM that violate statutes prohibiting discriminatory practices in federal employment and mandating equal pay for equal work throughout the federal workforce.  Moreover, the Agency intends this disparity to increase over time.

26.     One component of federal salaries is "locality pay" that is paid to employees in the contiguous United States pursuant to the Federal Employee Pay Comparability Act of 1990, Pub. L. 101-509, title v, Sec. 529 (Sec. 1-412), 104 Stat. 1427 ( Nov. 5. 1990) ("FEPCA" or "1990 Act") and to federal employees in COLA areas (and other non-foreign areas) pursuant to the Non-Foreign AREA Act of 2009.   The methodology for setting locality pay rates was developed by administrative officials for use in the contiguous United States.   As applied to COLA areas, which are different from the rest of the United States in many ways, the current methodology does not achieve the purposes of the 2009 Act or the 1990 Act.

27.     The magnitude of the bias in locality pay methodology against COLA areas can be seen, for example, in Honolulu, Hawaii.   Federal employees throughout Hawaii have a locality pay rate of only 16.51% in 2014, while employees in the Washington D.C. area have a locality pay rate of 24.22%, even though living costs in Honolulu are measured by OPM as being 25% higher than living costs in the D.C. area. In other words, the locality pay rate in Honolulu is 33% lower, on a job-for-job basis, than in the D.C. area, even though living costs are 25% higher.   A similar disparity exists to a greater or lesser degree in every COLA area.

28.     In Puerto Rico, the U.S. Virgin Islands, Guam, and the Northern Mariana Islands, OPM has decided that the "applicable" locality pay rate will be the same as that for all of the lowest-cost places in the contiguous United States, which is currently 14.16%.   Assigning these high-cost trans-oceanic areas to an otherwise homogeneous region of the North American continent, for the ostensible purpose of providing equal pay for equal work, makes absolutely no sense, and it is not required by the 2009 Act or

the 1990 Act.   In fact, the Agency is ignoring instructions from Congress in 1994 requiring "consideration of alternative approaches to dealing with the unusual and unique circumstances" of COLA areas.   Pub. L. 103-329, 108 Stat. 2382, 2413.

29.     The methods chosen by OPM to implement the 2009 Act are arbitrary and capricious.   They are inconsistent with the purposes and policies of the 2009 Act (and of FEPCA).   In addition, as applied to COLA areas, the current locality pay methodology results in violations of the Civil Rights Act of 1964, Pub. L. 88-352, 78 Stat. 241 (July 2, 1964), and the Civil Service Reform Act of 1978, Pub. L. 95-454, 92 Stat. 1111 (Oct. 13, 1978).   Although OPM has rule-making authority under the 1990 Act and the 2009 Act to modify the methodology so as to achieve Congressional purposes and avoid violations of the earlier statutes, the Agency has refused to utilize this authority.   The nonfeasance of the Agency violates 42 U.S.C. § 2000e-16 and 5 U.S.C. § 2302(b).

30.     In addition, OPM has failed, following the enactment of FEPCA, to exercise its "special pay authority" under a separate statute (5 U.S.C. § 5305) to increase federal salaries in non-foreign areas so as to mitigate and prevent pay discrimination and promote pay equality.   These failures are separate violations of 42 U.S.C. § 2000e-16 and 5 U.S.C. § 2302(b).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

31.     On February 12, 2013, Plaintiffs delivered to OPM at its Washington D.C. office a comprehensive set of documents that included and explained the charges of unlawful discrimination set forth in this complaint.

32.     On March 25, 2013, Plaintiffs sent a letter (via courier) to OPM, requesting "counseling" pursuant to 29 C.F.R. § 1614.105 and 29 C.F.R. § 1614.204(b).   This

request was repeated in an email sent to the EEO office of OPM on March 26, 2013. The Agency acknowledged receipt and the counseling process occurred.

33.     On April 19, 2013, OPM sent Plaintiffs' attorney a letter requesting an extension of the counseling period, and a 30-day extension was allowed.

34.     On May 17, 2013, OPM issued a Final Interview Letter that terminated counseling and authorized the filing of a formal EEO complaint with the Agency.  In an email transmitting the letter, Yasmin Rosa, Senior EEO Specialist and Informal Complaints Manager for OPM, stated:  "The inquiry into the allegations brought forth by you and your associates on behalf of Ms. Rodriguez, Class Agent, has been completed. I spoke with management officials and communicated the claims raised by the class. Management's response into the allegations of discrimination was that the issues are a matter of law and the '*statutes allow for no discretion on the part of OPM.  In the absence of discretion, there can be no improper discrimination.*'"  (emphasis in original).

35.     On May 31, 2013, each of the named Plaintiffs filed with OPM a document in the form prescribed by OPM entitled "OPM Formal EEO Complaint."  The formal complaints were accompanied by extensive Addenda detailing the claims of discrimination and the related claims arising under other laws as described above.  In addition, on June 3, 2013, Plaintiff Rosa Rodriguez (recognized by OPM as the lead agent for the class) filed a comprehensive Memorandum in support of the formal complaints.

36.     On June 19, 2013, OPM sent to the Equal Employment Opportunity Commission ("EEOC") (via courier) a copy of the formal complaint filed by Plaintiff Rosa Rodriguez, together with the EEO counselor's report and (as stated in the cover letter from OPM to EEOC) "all other relevant documentation."

37.     To date, OPM has not issued a decision or otherwise resolved the matter as directed by 5 U.S.C. § 7702(a)(2).  The EEOC did, however, through Mary Jo Mosca, Administrative Judge, issue an "Acknowledgement and Order for Class Certification" that was served by mail upon Ms. Rodriguez and her counsel on January 15, 2014, in which EEOC acknowledged that the proceeding had been brought as a "class complaint."  Plaintiffs responded to that order by their Statement In Support Of Class Certification dated January 31, 2014.  However, more than 120 days have elapsed since Plaintiffs filed their formal complaints as authorized by OPM's letter of May 17, 2013, and by applicable law.   Accordingly, Plaintiffs are entitled by 5 U.S.C. § 7702(e)(1) to bring this case in federal district court.

38.     In addition, each and every member of the class has exhausted his or her administrative remedies, by virtue of the fact that Plaintiffs, through Ms. Rodriguez as class representative, submitted an EEO Informal Complaint, began informal counseling, received a Final Interview letter, and within 14 days filed a Formal EEO Complaint that was not resolved within 120 days.

39.     In the alternative, the exhaustion requirement is waived, by operation of law, as to any and all class members who have not exhausted their administrative remedies, whether or not they are named class representative:

(a)     Under the "single filing exception" to the exhaustion requirement;

(b)     Because the purpose of administrative exhaustion, *i.e.*, notice to the Agency, has been fulfilled;

(c)     Because such administrative claims would be futile in light of OPM's position that it is statutorily barred from granting the relief that Plaintiffs request, and no valid purpose would be served by requiring each and every class member to file and prosecute an individual administrative claim; and

(d)     Because the class members would be irreparably harmed by the expense and delay caused by forcing them to engage in the futile act of filing individual administrative claims.

## JURISDICTION AND VENUE

40.     The Court has jurisdiction over this "mixed case" under one or more of the following statutes:  5 U.S.C. § 7702, 28 U.S.C. § 1361, 28 U.S.C. § 1367, and/or 28 U.S.C. § 1331.

41.     Venue is proper in this district pursuant to one or more of the following statutes: 5 U.S.C. § 7703(b)(2), 42 U.S.C. § 2000e-5(f)(3), and/or 28 U.S.C. § 1391(e).

## CLASS ACTION ALLEGATIONS

42.     Plaintiffs bring this action on their own behalf, and on behalf of a class of all similarly situated individuals, pursuant to Rule 23(a), 23(b)(1), 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure.

### Class Definition

43.     The class in this case consists of (a) all persons whose regular salaries as federal employees currently include, or did in the past include, or will in the future

include, amounts "based on living costs substantially higher than in the District of Columbia" that are paid pursuant to Section 207 of the Independent Offices Appropriations Act, Chap. 219, Sec. 207, 62 Stat. 176, 194 (April 20, 1948), as amended by Chap. 775, Sec. 207, 62 Stat. 1196, 1205 (June 30, 1948), or any codification of Section 207, and pursuant to Executive Order 10000 (September 16, 1948), as amended from time to time, and (b) all persons who are now, or were in the past, or become in the future, a surviving spouse of such an employee.

44.     In this class definition, the term "federal employees" includes all persons employed by the United States or by an agency, establishment, or instrumentality thereof, or by a corporation owned by the United States, including employees of the United States Postal Service, the Administrative Office of the United States Courts, the General Accounting Office, and Non-Appropriated Fund agencies.

**Class Action Criteria**

45.     There are in excess of 100,000 class members.  Joinder of all class members is therefore impracticable.

46.     The claims of the named Plaintiffs are typical of those of all members of the class.

47.     The questions of law and fact that are presented are applicable in common to all class members.

48.     The named individual Plaintiffs are members of the class and represent a variety of classifications and agencies, and they will be able fairly and adequately to represent and protect the interests of the class.  They have retained counsel who are

experienced in class action litigation and litigation against the United States, including class actions involving the COLA program.

49.     The class is large in number and widely dispersed.  The prosecution of separate actions by fewer than all members of the class would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, and that would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

50.     Defendants have acted or failed to act on grounds generally applicable to the class, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole.  The same formula will be used to correct the payroll and accounting records of all class members.  Amounts due for underpayment of annuities and salaries will appear in these corrected records, and precise payments can be made in accordance with the judgments and orders of the Court.  If any facts or records are needed for the Court's decisions, they are in the possession of Defendants and are readily accessible.

51.     Common questions of law or fact predominate over any question affecting any individual member of the class. It would be financially impractical, if not impossible, for class members to prosecute their claims on an individual basis in non-class suits. A class action is the only available means for the fair and efficient adjudication of this matter.

## CLAIMS FOR DECLARATORY JUDGMENT

52.     Defendants' actions of which Plaintiffs complain herein, regarding both annuities and salaries, are unlawful or otherwise invalid, both procedurally and substantively, for the reasons stated elsewhere herein.  Pursuant to Section 6 of the Administrative Procedure Act, 5 U.S.C. § 706, which directs the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; . . . or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court,"  and pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, which authorize the Court to declare the rights and obligations of the parties and to issue declaratory judgments, Plaintiffs hereby request the Court to enter the following declarations, findings, conclusions, and judgments.

### Annuities

53.     **Congress and the President intended to include COLA in the retirement base, and the Agency's practices and regulations to the contrary are, therefore, null and void.**

(a)     Congress enacted Section 207 of the Independent Offices Appropriations Act on April 20, 1948, to standardize the purposes and rates of additional compensation already being paid by longstanding administrative practice to federal employees stationed outside the contiguous United States.  The section (as

clarified two months after it was enacted) specified two separate grounds for paying such compensation – either "living costs substantially higher than in the District of Columbia" or "conditions of environment which differ substantially from conditions of environment in the States and warrant additional compensation as a recruitment incentive" – and set a maximum rate of 25% in both cases.  The section authorized the continuation of such additional compensation "only in accordance with regulations prescribed by the President."

(b)     In Section 207 as clarified, Congress used the term "additional compensation" to mean a pay component that is paid (outside the contiguous United States) as an addition to the standard component provided to all federal employees by the Classification Act of 1923, as amended.  The standard component is now called GS pay.   The additional compensation was usually called a "salary differential" (or sometimes a "compensation differential" or a "25 percent differential" or just a "differential").   In the report of the House Appropriations Committee on Section 207, it was called a salary differential; it was not called an allowance.  (House Report 80-1288, January 30, 1948.)  By widespread practice, the salary differential was considered as part of the base pay for the position.  It was included with the standard component in payroll records.  The combined amount was used for calculating retirement deductions, overtime pay, and other purposes.

(c)     In enacting and clarifying Section 207, Congress did not intend to change the practice of including the salary differential in the base used for calculating retirement deductions and annuities.   Previous statutes had specifically excluded other pay components from the retirement base when that was the intention of Congress –

*e.g.*, a 1944 statute specifying that severance pay "shall not be regarded, except for purposes of taxation, as salary or compensation and shall not be subject to retirement deductions" (58 Stat. 845) – and this was not done in Section 207.  If a change in federal retirement benefits had been intended, Congress would have said so.  There is no evidence of any such intent.  On the contrary, by using the term "cost-of-living allowance" in Section 207 to refer to additional compensation payable to U.S. citizens working on temporary assignments in foreign countries, and by carefully avoiding the term in reference to additional compensation paid to federal employees residing permanently in non-foreign areas, based on the high costs of living in those areas, Congress demonstrated its understanding that the latter is in fact a salary differential, as it had always been called, not an allowance within the meaning of the retirement laws, and that it would continue to be included within the retirement base.

(d)  On September 16, 1948, President Truman issued Executive Order 10000 to give effect to the difference between living costs and environmental conditions as the basis for paying higher salaries outside the contiguous United States, as specified by Congress.  In Section 208(b) of the executive order, President Truman excluded from the base for retirement purposes additional compensation based on environmental conditions, but additional compensation based on living costs (*i.e.* COLA) remained included.  The President clearly intended COLA to be treated differently from a post differential.  There are good reasons for this distinction, as explained below. Executive Order 10000 was amended in 1985 to replace the word "Territorial" with the phrase "Non-foreign area," but otherwise Section 208(b) remains unchanged to this day.

(e)     The primary purpose of a post differential is to attract qualified non-residents to work in a non-foreign area where there are extraordinarily difficult living conditions, excessive physical hardships, or notably unhealthful conditions.   (The following non-foreign areas are eligible for post differential but not COLA:  American Samoa, Johnston Atoll, Midway Atoll, and Wake Atoll.)   The recruit is expected to come from some other place (including a COLA area) and to return to a permanent residence upon retirement or completion of the tour of duty.   For this reason, President Truman considered it inappropriate to include the temporary differential in the total amounts of compensation from which an average is calculated in determining the amount of the retirement annuity.   A post differential is intended to compensate for temporary needs that will not continue during retirement.

(f)     By contrast, COLA is payable in Hawaii, Alaska, Puerto Rico, the U.S. Virgin Islands, Guam, and the Northern Mariana Islands "based on living costs substantially higher than in the District of Columbia."   These areas have large populations and are no less habitable than places in the contiguous United States.   In 1948 a large percentage of the federal employees in each of these areas were being recruited from within the area, and today that percentage is approaching 100%.   These employees are just as likely to remain in their place of residence after retirement as are federal employees in the contiguous United States.   In fact, employees in transoceanic COLA areas have far less ability to relocate after retirement than do employees in the contiguous United States.   Federal employees in COLA areas are not expected to "return home" at some point; they are already home.   Congress and President Truman understood this in 1948, and so it remains today.

- 19 -

(g)   The distinction drawn by President Truman between temporary and permanent posts in non-foreign areas in Section 208(b) of the executive order is exactly like the distinction drawn by Congress between foreign and non-foreign posts in Section 207 of the 1948 act.  The need for additional compensation to employees on temporary assignment in foreign or non-foreign areas will not continue during retirement. Employees who permanently reside in COLA areas, on the other hand, cannot hope to have the same standard of living during retirement as employees doing the same work in the contiguous United States, if a large part of their regular salaries is excluded from the base for calculating annuities while the regular salaries of all other employees are fully included.

(h)   It is beyond any reasonable doubt that Congress and the President specifically intended COLA to be included in the retirement base.  The entire salary of a GS employee in a COLA area is "fixed by law or regulation" and therefore constitutes "the base pay of the position" as those terms have been used in the retirement statutes since 1920.  Accordingly, COLA must be counted in calculating the annuity.  This was the understanding of agencies paying COLA before 1948 (when it was called a salary differential), and it was the understanding of Congress and the President when they acted in 1948 to standardize the rates and purposes of additional compensation in foreign and non-foreign areas.  Moreover, this is the only conclusion that is consistent with all of the statutes enacted by Congress since 1948 to govern the rules and policies of the civil service.

(i)   Therefore, the regulations and practices of OPM and its predecessor that purport to exclude COLA from the base for retirement and other purposes are

contrary to the understanding and intention of Congress and the President, are in excess of the Agency's statutory power and discretion, and are null and void.  The Court is directed by 5 U.S.C. § 706, clause 2(C), to hold unlawful and set aside these unlawful rules.

54.     **The Agency rule excluding COLA from the retirement base is procedurally null and void.**

(a)     The Agency has never provided notice and opportunity for comment on any rule (regulation or practice) excluding COLA from the base for retirement and other purposes, or on the continuation or modification of any such rule. On the contrary, scrutiny by affected employees and agencies has been discouraged by false and misleading comments by the Agency that were published from time to time in connection with other regulations.

(b)     On December 30, 1948, shortly after Executive Order 10000 was issued by President Truman, the Civil Service Commission published a set of implementing regulations in the Federal Register that by their terms were to become effective on January 1, 1949.  13 Fed. Reg. 8725, 8727.  The Agency did not, either in the Federal Register notice or previously, seek comments from affected employees or agencies.  Given the very short time period between publication and the effective date of these regulations, it is highly unlikely that the regulations came to the attention of employees or Agency managers in non-foreign areas.

(c)     The new regulations obliterated the important distinction between COLA and post differentials that President Truman had drawn in Section 208(b) of the executive order.  The regulations stated:  "Neither a territorial post differential nor a

territorial cost-of-living allowance shall be included in the base used in computing overtime pay, night differential, holiday pay, retirement deductions, or any other additional compensation, allowance, or pay differential." 5 C.F.R. § 350.6(f); 13 Fed. Reg. 8725, 8727.  The regulations also cited a letter from the Commissioner of Internal Revenue for the proposition that both forms of additional compensation are subject to federal income tax. 5 C.F.R. § 350.6(h); 13 Fed. Reg. 8725, 8727.

(d)     Upon information and belief, the Civil Service Commission was cognizant of the difference intended by President Truman between post differential and COLA for purposes of retirement, and of the absence of any intention by Congress or the President to discontinue including COLA in the retirement base, but the Agency nevertheless decided, for unlawful reasons, to commence a form of discrimination against COLA area employees that continues to the present day.  The Agency did not, in 1948 or at any time since then, inform class members of (i) the fundamental inconsistency between its regulation and Section 208(b) of the executive order or (ii) the devastating effect of the regulation on their retirement income.

(e)     In subsequent years, OPM (not the Civil Service Commission) made certain changes in the language of the regulation.  The changes were increasingly adverse to employees, always issued without notice and opportunity for comment by affected employees and agencies, in violation of the Civil Service Reform Act of 1978, and often accompanied by false and misleading statements by the Agency that were intended to, and did, discourage class members from questioning the exclusion of COLA from the base for retirement deductions and matching contributions.

(f)     The regulation first codified at 5 C.F.R. § 350.6(f) was not a discretionary exercise of rulemaking power.  The Agency has maintained the position, first expressed publicly by OPM in 2002 at 67 F.R. 22340, that it lacks legal authority to include COLA in the retirement base (or, of course, to exclude it).  This provision and the statement about taxation at 5 C.F.R. § 350.6(h) were unsubstantiated and incorrect predictions, for the guidance of payroll offices, of what the law would be determined to be if a case came before a court or tribunal.

(g)     The Agency's prediction about taxation of COLA proved to be wrong.  Rev. Rul. 237, 1953-2 C.B. 52.  The Internal Revenue Service concluded that COLA is non-taxable, while post differential is subject to tax.  The Agency's prediction about exclusion of COLA from the retirement base is wrong as well.  Congress did not intend the difference between pay for living costs and pay for environmental conditions, so clearly expressed in Section 207 of the statute and in Executive Order 10000, to be recognized in the tax rules but ignored in the retirement rules.

(h)     In summary, if the rule is intended as an exercise of Agency power or discretion – which OPM denies – then the Agency has failed to comply with the notice and comment requirements of the Administrative Procedure Act, and the rule is invalid for that reason.  In that case, the Court is directed by clause 2(D) of 5 U.S.C. § 706 to hold unlawful and set aside these unlawful rules.

55.     **The Agency's exclusionary rule is arbitrary and capricious, and it is null and void for that additional reason.**

(a)     As a result of Defendants' ongoing practice of excluding COLA from the retirement base, class members have suffered, and continue to suffer, an extreme

hardship after they retire.  There is no rational basis for this practice or the regulation on which it is based.  The rule is arbitrary, capricious, an abuse of discretion, and unwarranted by the facts.

(b)     The Agency has never offered a policy justification for excluding COLA from the retirement base.  Since 2002, OPM has maintained the position that it lacks statutory authority to include COLA in the base because, the Agency contends, Congress intended to exclude it.   The only evidence ever cited by OPM for this conclusion is the fact that the term "allowances" appears in 5 U.S.C. § 5941.

(c)     However, the term "allowances" was first suggested by a code reviser during the 1966 re-codification of Title 5 of the United States Code as a replacement for the term "additional compensation" that had been used in the 1948 statute and in all previous editions of the Code.  The committee reports preceding the 1966 re-codification emphasize that the change in terminology was intended to have no effect on the substance of the law.  Senate Report 89-1380 (July 21, 1966); House Report 89-901 (August 31, 1965).

(d)     The intent of Congress must be determined from the text and circumstances of Section 207 when it was enacted in 1948.   This evidence (summarized in paragraph 53 above) shows that Congress, as well as President Truman, understood and intended that COLA would continue to be included in the base for retirement.  The ongoing failure of OPM and its predecessor to examine and act upon this evidence is arbitrary and capricious.

(e)     No public policy or valid purpose is served by excluding COLA from the retirement base.   On the contrary, the Agency's exclusionary rule defeats the

purpose of paying COLA, which is "to enable employees to render more complete and efficient service in carrying out their official assignments."  Rev. Rul. 50-407, 1959-2 C.B. 19.  The full regular salaries of employees in the contiguous United States have been included in the retirement base since 1920, and such salaries have included locality pay – functionally equivalent to COLA in every way – since locality payments began in 1994.  The Agency's arbitrary practice reduces the value of COLA and of the entire salary, undermines the efficacy of the salary for the purposes Congress intended in the 1948 authorization, and violates other statutes intended to prevent exactly this kind of discrimination.

(f)     Furthermore, if the Agency's rule excluding COLA from the retirement base is intended as an exercise of Agency power or discretion – which, again, OPM denies – then the rule is invalid pursuant to 5 U.S.C. § 706, clause 2(A), as well as other clauses, and the Court is directed for this additional reason to hold it unlawful and set it aside.

56.     **The exclusionary rule and related rules discriminate against racial and ethnic minorities, in violation of Section 717 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16.**

(a)     The practice of excluding COLA from the retirement base has been followed over and over again in every payroll period, and the regulation purporting to require this practice has been issued annually in each successive edition of the Code of Federal Regulations.  The rule is based on discriminatory intent and has a disparate and extremely adverse impact on protected minorities.

(b)     Defendant OPM and its predecessor, the Civil Service Commission, knew and understood at all times that the rule excluding COLA from the base for computing retirement benefits and other benefits has a disparate and extremely adverse impact on members of protected minority groups.  The Agency, not Congress, intended this result.

(c)     The Agency's rule excluding COLA from the retirement base was intended to have, and did have, an adverse disparate impact on racial and ethnic minorities.  This discrimination is not the unavoidable consequence of a rule aimed at a worthy goal; it is the intended consequence of a rule that has no justification whatsoever.

(d)     Accordingly, the ongoing and repeated practices of Defendants in excluding COLA from the retirement base constitute ongoing and repeated violations of 42 U.S.C. § 2000e-16.  In addition, these practices are the result of other actions by the Agency, each of which also violates 42 U.S.C. § 2000e-16.

(e)     From the public statements of OPM, it is clear that in excluding COLA from the retirement base the Agency relied solely on current editions of the United States Code in which, since 1966, COLA is called an allowance, disregarding any and all evidence of the original and continuing intent of Congress and the President, and disregarding the fact that the 1966 change in terminology was made by a clerical code reviser without substantive effect, as explained by the Congressional committees in charge of the re-codification process.  Thus, the Agency's practice of excluding COLA from the retirement base, in addition to being an unlawful rule itself, is also the result of a separate and implicit rule to the effect that any pay component – such as COLA – that

happens to be called an allowance in a current edition of the United States Code is thereby excluded from the retirement base.  This underlying rule, which is not based on location in any way, has a disparate adverse impact on racial and ethnic minorities in violation of 42 U.S.C. § 2000e-16.

(f)      Moreover, the Agency has never fulfilled its statutory responsibility to issue regulations giving effect to the term "basic salary, pay, or compensation" or the term "base pay of the position" as used in the Civil Service Retirement Act of 1920, as amended.  The duty to issue regulations has been explicit in the retirement statutes from their inception.  Yet the Agency has never conducted any proceeding for the purpose of explaining or defining the statutory terms, nor has it ever offered a substantive or policy reason for excluding COLA from the scope of these terms.  In fact, the exclusion is not only extremely unfair to class members, but also counterproductive to the national interests served by the federal retirement system, as a rulemaking process including notice and opportunity for comment would have clearly revealed.  The practice of excluding COLA from the retirement base is the direct result of the Agency's failure to engage in such a process and to issue regulations giving effect to the essential terms of the retirement statute.  This failure has had, and is continuing to have, a disparate adverse impact on racial and ethnic minorities.  It has left federal employees in non-foreign areas as the only class of federal employees whose regular compensation for a normal workweek is not entirely included in the retirement base.  The Agency's ongoing failure to meet its statutory obligation to issue regulations is, like the rule described in the preceding paragraph, not based on location in any way, and it is a separate ongoing violation of 42 U.S.C. § 2000e-16.

- 27 -

(g)     Defendant OPM has both the power and the duty under 5 U.S.C. §§ 8347(a) and 8461(g) to end the ongoing practices immediately, and to change the regulations described above by issuing new regulations, so as to include COLA in the retirement base and prevent further harm to protected minorities and all other class members.

57.     **The exclusion of COLA from the retirement base is a "prohibited personnel practice" by the Director of OPM, in violation of 5 U.S.C. § 2302(b).**

(a)     Under 5 U.S.C. § 2302(b), a "prohibited personnel practice" includes taking, directing others to take, recommending, or approving – by any employee of the United States, including the Director of OPM – any violation of 42 U.S.C. § 2000e-16, any decision concerning pay or benefits that is contrary to a principle stated in 5 U.S.C. § 2301 (including the principle of equal pay for equal work), and certain other kinds of personnel actions also specified in the statute.  In this case, the Director's acts and omissions with regard to the treatment of COLA for purposes of retirement annuities and other benefits are prohibited personnel practices.

(b)     As the Director of OPM, Defendant Katherine Archuleta has the authority and responsibility to calculate and pay annuities to retired federal employees, and to maintain pay records of current employees for that purpose.  By excluding COLA from (or failing to include COLA in) the retirement base, and by failing to include COLA in the pay records maintained for current employees for that purpose, the Director and her predecessors have engaged in repeated, ongoing, and prohibited personnel practices, in violation of 5 U.S.C. §§ 2302(b)(1)(A) and 2302(b)(12).

58.   **The exclusion of COLA from the retirement base violates the rights of all federal employees to receive pay of equal value for work of equal value.**

(a)   Annuities received by federal retirees are an essential part of their overall compensation.  The underpayment of annuities to class members in this case violates their rights under federal common law to receive pay of equal value for work of equal value (which rights are described in paragraph 65 below), in addition to exceeding the Agency's authority and violating 42 U.S.C. § 2000e-16 and 5 U.S.C. § 2302(b).

**Salaries**

59.   **Applying current locality pay methodology to non-foreign areas, without taking steps to mitigate adverse and unlawful effects, will increase the degree of pay inequality in non-foreign areas, contrary to the intention of Congress.**

(a)   The Non-Foreign AREA Act of 2009 ends the program enacted by Congress and implemented by President Truman in 1948 for measuring living costs periodically in COLA areas and the Washington D.C. area.  Although COLA payments will continue for decades to come, COLA rates no longer indicate how much higher the costs of living in non-foreign areas actually are than the costs of living in the high-cost area that is the nation's capitol.

(b)   The new statute provides that COLA is to be replaced gradually by locality pay, which federal employees in the contiguous United States have been receiving since 1994.  The COLA rate in effect for any non-foreign area when the statute was enacted will be reduced by 65% of the "applicable" locality pay rate for the area, until the COLA rate reaches zero.  In effect, COLA (which is exempt from federal

income tax) will be replaced by locality pay (which is taxable) on an after-tax dollar-for-dollar basis.  The first 35 cents of a locality pay dollar are needed for federal and non-federal taxes on that dollar, leaving 65 cents to be used for replacing that much of a COLA dollar.  This means that a 25% COLA will not be fully replaced by locality pay until the locality pay rate applicable in that area reaches 38.46%.

(c)     Reducing unfairness to federal employees in non-foreign areas was the purpose of the 2009 Act.  However, the Act contains a feature (drafted by OPM) that is extremely adverse to this class of employees, which was never explained to them (or to the Congressional sponsors of the legislation), and that most employees – and perhaps even the sponsors – still do not understand.  During the decades that will be needed to convert COLA to locality pay at the 0.65 conversion rate selected by Congress, pay increases in non-foreign areas will be only a fraction of pay increases in the contiguous states and the District of Columbia.  When all other employees receive the normal annual increase in pay, divided between an increase in GS rates and an increase in locality pay rates, employees in non-foreign areas will receive only the GS increase.  In this way, the salary lag that began in 1990 with the unfortunate exclusion of non-foreign areas from the locality pay program is being perpetuated by the 2009 Act.  Unless Defendants take steps to mitigate this adverse result, the cost of any increase in retirement benefits provided by the 2009 Act for non-foreign area employees who retire after 2009 will be paid, in effect, out of their own pockets.

(d)     Congress intended Defendants to take further steps to prevent adverse consequences.  As Senator Akaka, one of the primary sponsors of the 2009 Act, stated, the Act "is not to be seen as the last word, only the latest step forward"

toward achieving pay equity in non-foreign areas.  Congressional Record, Volume 154 Issue 78 (May 13, 2008).  This understanding was reiterated by Senators Schatz and Hirono in a letter to Defendant Archuleta dated January 31, 2014.

(e)    Congress intended, in the 2009 Act, to protect the take-home pay of federal employees in non-foreign areas.  Congress did not intend, for example, to replace a fair system for calculating COLA rates – finally achieved in the 2000 settlement of *Caraballo v. United States*, 97-cv-00027-AET-GWC (D.V.I.), after decades of litigation – with an unfair system for calculating locality pay rates.  Yet OPM has decided to do just that.  The steps taken by OPM to implement the 2009 Act, and its failure to take the other steps that are within its authority under that 2009 Act and previous acts, violate Section 1915(a)(1) of the 2009 Act and will increase, not reduce, the degree of pay inequity in COLA areas.

(f)    The methodology employed by Defendants for setting locality pay rates in the contiguous United States includes (a) rules for defining locality pay areas and changing their boundaries and (b) rules for measuring salary costs within locality pay areas and comparing costs between areas.  The latter rules are a complex mathematical algorithm.  The algorithm is being developed by academicians and statisticians who are employed by universities and federal agencies apart from OPM. The algorithm is unfinished and evolving.

(g)    All available evidence indicates that the current algorithm is biased against employees in non-foreign areas and is unable to account for the unique circumstances of those areas, and that applying it to non-foreign areas will not achieve

the purposes of the 2009 Act or the purposes of the locality pay program as enacted in 1990.

(h)     When the locality pay program was created by Congress in 1990, federal salaries were lagging behind private salaries throughout the nation, but by different amounts in different regions.  Of equal importance, differences in living costs from region to region, or even city to city, were leading to substantial disparities in real income levels and standards of living afforded to federal employees by General Schedule salaries, that were uniform, in nominal dollars, on a job-for-job basis across the nation.  The unfairness represented by both of these factors was having adverse effects on the recruitment, retention, and performance of the federal workforce.  To raise federal salaries, and to reduce pay inequality, the locality program was created.

(i)     This dual purpose is being thwarted by the acts and omissions of OPM in carrying out the decision of Congress in 2009 to extend the locality pay program to non-foreign areas.  On the course OPM is now taking, the effect will be to withhold pay increases from federal employees in non-foreign areas and reduce the value of their salaries for years to come.   As living costs rise, and as employees in the contiguous United States receive raises from time to time, employees in non-foreign areas will receive smaller raises or no raises at all.  There is no end in sight to this handicap.  The adverse effects that this handicap will have on recruitment, retention, and performance are clear and substantial.

(j)     When the process of replacing COLA with locality pay is finally completed, perhaps decades from now, then, after enduring the pay lag described above throughout the transition period, employees in non-foreign areas will be left at the

end with salaries that are lower in purchasing power than they are today if no steps have been taken to counteract the bias in locality pay methodology.  This is not the result intended by Congress.

(k)   As the agency primarily responsible since 1990 for the administration of the locality pay program, OPM is authorized to issue regulations governing both aspects of the locality pay methodology, *i.e.* defining areas and setting rates.  5 U.S.C. § 5304(i).  However, OPM has never issued regulations to govern the methodology, or to evaluate its performance, or to counteract effects that are contrary to the goals of Congress.  In addition, at all times since federal employees in the contiguous United States began to receive locality pay (and previously), OPM has been authorized by 5 U.S.C. § 5305 to set special GS rates for non-foreign areas in order to reduce pay inequality, but the Agency has never taken this step either.  As a result, class members are now facing decades of continued discrimination in overall salary levels, just as they have already endured decades of discrimination in retirement annuities.

(l)   The ongoing failure of OPM to take either step described in the previous paragraph constitutes agency action as defined in 5 U.S.C. § 551, clause 13, which is being unlawfully withheld and unreasonably delayed within the meaning of 5 U.S.C. § 706, clause 1.  Such action is inconsistent with the purposes and policies of the 1990 Act and the 2009 Act, and it is also unlawful and must be remedied pursuant to 5 U.S.C. § 706, clauses 1 and 2.

(m)   Apart from Defendants' failures to act, the actions they have taken also violate the Administrative Procedure Act and entitle Plaintiffs to relief.   The

application, by OPM and other officers and agents of the United States, of current locality pay methodology to non-foreign areas is arbitrary, capricious, and an abuse of discretion, in violation of 5 U.S.C. § 706, clause 2(A).  There is nothing in the 2009 Act or the 1990 Act that requires Defendants to disregard the unusual and unique circumstances of non-foreign areas in setting locality pay rates.

60.   **The rule underlying the assignment of Puerto Rico, the U.S. Virgin Islands, Guam, and the Northern Mariana Islands to the RUS locality pay area will increase the degree of pay inequality in those remote and insular areas, contrary to the intention of Congress.**

(a)   In its 2010 regulation "on behalf of" the President's Pay Agent, OPM assigned Puerto Rico, the U.S. Virgin Islands, Guam, and the Northern Mariana Islands to the RUS ("Rest of U.S.") locality pay area.  This decision was not required by the 2009 Act, and other choices were available that would better serve the purposes and policies underlying the Act.  The choice made by Defendants undercuts and defeats the goals of Congress in enacting the locality pay program and in extending the program to non-foreign areas.

(b)   Although subsection (f)(2)(b) of 5 U.S.C. § 5304 purports to limit judicial review of regulations defining new locality pay areas and adjusting the boundaries of existing areas, that subsection does not apply to any other rules concerning the locality pay methodology.  For example, it does not apply to rules for setting locality pay rates within areas that are authorized by other subsections.  Also, it does not apply to the underlying general rule on which the 2010 regulation was based,

as explained below.   Therefore, it is not necessary to decide whether 5 U.S.C. § 5304(f)(2)(b) was intended to preclude this claim.

(c)   The regulation assigning trans-oceanic areas to the RUS locality pay area is, in effect, a decision pursuant to a different rule (implicit rather than explicit) that has been adopted and followed by Defendants but never mandated or approved by Congress.   This implicit rule provides that, whenever a region is not populous enough, or is not otherwise suitable, to be a locality pay area of its own, then that area will be grouped with all other such areas for purposes of assigning an average locality pay rate applicable to them all, rather than associated with, and assigned the rate of, a locality pay area to which it is similar or its circumstances are similar.   Stated another way, the implicit rule allows specific locality pay areas (*i.e.* all except the RUS area) to be expanded to include contiguous areas, but not to be expanded to include noncontiguous areas.   Under this rule, only the RUS area can be expanded to include noncontiguous areas, such as non-foreign areas, even though the noncontiguous areas may be much more similar to some of the specific locality pay areas than to any region within the RUS area.

(d)   The implicit rule described above is inconsistent with the purposes and policies of the Acts of 1990 and 2009.   It is also arbitrary, capricious, an abuse of discretion, and in excess of Defendants' authority, all in violation of 5 U.S.C. § 706, clauses 2(A) and 2(D).

61.   **Failing to preserve higher levels of compensation in the outer Hawaiian Islands and in the rural areas of Alaska will increase the degree of pay inequality in those areas, contrary to the intention of Congress.**

(a)     For many decades, COLA rates in the various Hawaiian Islands have been set separately, as have COLA rates in various cities or regions of Alaska. Although Congress expressed, in the 2009 Act, a preference that the entire states of Hawaii and Alaska become single locality pay areas, and OPM adopted this approach in its 2010 regulation, there is nothing to prevent OPM, utilizing its rulemaking authority under existing statutes, from making different degrees of adjustment to the locality pay rates or the GS rates for the separate non-foreign areas that are recognized within the two states.  Such authority exists under 5 U.S.C. § 5304(i) and 5 U.S.C. § 5305, as well as under the 2009 Act.  By failing to do so, OPM has contravened the underlying purposes and policies of the 2009 Act.

(b)     Action by OPM as described above is being unlawfully withheld and unreasonably delayed within the meaning of 5 U.S.C. § 706, clause 1.  Such action is unlawful and must be remedied pursuant to 5 U.S.C. § 706, clauses 1 and 2.

62.     **Applying current locality pay methodology to non-foreign areas, and failing to take steps to mitigate the adverse effects of doing so, are separate violations of 42 U.S.C. § 2000e-16.**

(a)     As the Agency primarily responsible for the administration of the locality pay program since the inception of the program in 1990, OPM is authorized to issue regulations governing both aspects of the locality pay methodology, *i.e.* defining areas and setting rates.  However, OPM never has issued regulations to govern the methodology, or to evaluate its performance, or to counteract effects that are contrary to the civil service goals of Congress.  Now that Congress has extended (since 2009) the locality pay program to non-foreign areas, OPM has allowed an algorithm developed for

use in the contiguous United States to be applied by default to these remote and unique areas.  As a result, all class members are being subjected to continuing discrimination in violation of 42 U.S.C. § 2000e-16.

(b)     Defendant OPM knew and understood at all times that the acts and omissions described above were having disparate and adverse impacts on members of protected minority groups.  The Agency, not Congress, intended these results.  The conduct of OPM is based on discriminatory intent, having an intended and disparate adverse impact on protected minorities.

(c)     Regardless of intent, the practices of Defendants in the implementation of the locality pay program are, in fact and in law, rules of nationwide application that have disparate and adverse impacts on protected minorities in violation of 42 U.S.C. § 2000e-16.

63.     **The Agency's decision to assign Puerto Rico, the U.S. Virgin Islands, Guam, and the Northern Mariana Islands to the RUS locality pay area, the rule underlying the decision, and the failure to mitigate the decision's adverse effects, are all separate violations of 42 U.S.C. § 2000e-16.**

(a)     The decision of OPM to assign Puerto Rico, the U.S. Virgin Islands, Guam, and the Northern Mariana Islands to the Rest of U.S. locality pay area is a continuing violation of 42 U.S.C. § 2000e-16.  Congress did not intend, by 5 U.S.C. § 5304(f)(2)(b), to preclude judicial review of decisions having disparate adverse impacts on protected minorities in violation of the nation's civil rights laws.

(b)     Also, while subsection (f)(2)(b) of 5 U.S.C. § 5304 purports to limit judicial review of regulations defining new locality pay areas and adjusting the

boundaries of existing areas, that subsection does not apply to any other rules concerning the locality pay methodology.  For example, it does not apply to rules for setting locality pay rates within areas that are authorized by other subsections. Therefore, the subsection does not apply to the underlying implicit rule on which the 2010 regulation was based, *i.e.* the rule that, whenever a region is not populous enough, or is not otherwise suitable, to be a locality pay area of its own, then that area will be grouped with all other such areas for purposes of assigning an average locality pay rate applicable to them all, rather than associated with, and assigned the rate of, a locality pay area to which it is similar or its circumstances are similar.

(c)     Before Congress extended the locality pay system to non-foreign areas effective January 1, 2010, this implicit rule had not been applied in a manner that raised the issue of discrimination.   All regions requiring locality pay rates were contiguous to other such regions.  As populations shifted, and as costs (salary and living) increased in some places, such as growing urban regions, those places could be added to an adjacent locality pay area without creating an adverse effect in other areas.

(d)     Today, the adverse effects of this nation-wide rule on racial and ethnic minorities are disparate and extreme.  Pursuant to this rule, areas where costs of living are nearly the highest in the United States have been assigned to a locality pay area with the lowest rate of all, called Rest of U.S. or RUS.  The RUS area covers regions like Montana and Wyoming that are entirely unlike a trans-oceanic non-foreign area.  Living costs in every non-foreign area are far, far higher than any place in the RUS area, and locality pay rates in the non-foreign areas should be commensurately higher as well.

(e)     The current locality pay methodology assumes that job seekers can move easily and economically between areas, keeping salary costs of employers proportional to living costs of employees.  However, worker migration to and from non-foreign areas is severely restricted by a variety of unique physical and social factors.  Now that non-foreign areas are part of the locality pay system, some of the old rules do not make any sense.  The rule that required assigning Puerto Rico, the U.S. Virgin Islands, Guam, and the Northern Mariana Islands to the same locality pay area that includes Montana and Wyoming is one of them.

(f)     It is clear that the 2010 regulation was simply a decision (or "order" in the vernacular of the Administrative Procedure Act) applying the implicit rule.  There is nothing in the regulation to indicate that OPM had weighed alternatives or made a discretionary choice.  Rather, the regulation was stated as a conclusion, as if there were no other choice.   The rule underlying the decision violates 42 U.S.C. § 2000e-16, regardless of discriminatory intent.

(g)     Defendant OPM knew and understood that its decision would have a disparate and extremely adverse impact on members of protected minority groups.  The Agency, not Congress, intended these results.   The decision was based on discriminatory intent.

(h)     Defendants have authority to change this discriminatory rule to fit the new circumstances, allowing Puerto Rico, the U.S. Virgin Islands, Guam, and the Northern Mariana Islands to be assigned to a locality pay area for which the locality pay rate better serves the goals and purposes of the locality pay program.  Alternatively,

OPM has authority under 5 U.S.C. § 5305 and other statutes to create special rates of GS pay or locality pay so as to keep salaries in balance with costs of living.   The ongoing failure of Defendants to take either step is a separate violation of 42 U.S.C. § 2000e-16.

64.   **The acts and omissions of the Director of OPM and other officers and agents of the United States in applying current locality pay methodology to non-foreign areas are "prohibited personnel practices" in violation of 5 U.S.C. § 2302(b).**

(a)   Various officers and agents of the United States are charged by statute with critical roles in developing and executing the locality pay methodology. Salary decisions are generally made by the President within the limits of appropriations made by Congress.   Section 5304(e)(1) of title 5, United States Code, directs the President to establish the Federal Salary Council.   Under the law, the President appoints the Council members, which include three experts in labor relations and pay policy and six representatives of employee organizations representing large numbers of General Schedule employees.   The Council submits recommendations on the locality pay program to the President's Pay Agent, which is a triumvirate consisting of the Secretary of Labor, the Director of the Office of Management and Budget, and the Director of OPM.     The Council's recommendations cover the establishment or modification of pay localities, the coverage of salary surveys used to set locality pay, the process for making pay comparisons, and the level of comparability payments that should be made.   Under Executive Order 12764, the Office of Personnel Management provides administrative support for the Federal Salary Council.   Under 5 U.S.C. §

5304(f), the Pay Agent makes final decisions on creating locality pay areas and adjusting their boundaries, and forwards the other recommendation of the Council, along with recommendations of its own, to the President.  Under 5 U.S.C. § 5304(d), the President makes final decisions on locality pay rates.

(b)    The acts and omissions of all officers and agents described in the preceding paragraph are contributing to the unlawful discrimination in this case.  In addition to violating 42 U.S.C. § 2000e-16 as set forth above, Defendants are engaged in personnel practices that are prohibited by 5 U.S.C. § 2302(b)(1)(A).

65.    **Applying current locality pay methodology to non-foreign areas violates the statutory mandate of pay equality throughout the federal workforce and the right of every federal employee to receive equal pay for equal work.**

(a)    As succinctly stated by the Congressional delegates from the U.S. Virgin Islands, Guam, and the Northern Mariana Islands in a recent letter to the Director of OPM expressing their support for similar statements made by Representative Serrano of New York and Delegate Pierluisi of Puerto Rico:  "Federal employees and federal retirees in non-foreign areas have been the primary victims of discrimination by your agency for far too long."

(b)    Pay equality within the federal workforce may have been merely an unenforceable goal or policy when the principle was first introduced into the United States Code early in the last century by the Classification Act of 1923.  However, over the years, as Congress has expanded the statutory law governing the civil service by enacting the Classification Act of 1949, the Civil Service Reform Act of 1978, and the Federal Employees Pay Comparability Act of 1990, the expectations of federal

employees matured into legal rights.  The original principle of pay equality has been transformed into what current members of Congress have correctly characterized as a "mandate" that requires "pay of equal value for work of equal value" within the federal workforce.  Now, pay must be balanced with living costs on a regional basis. Employees performing the same level of work in different regions, facing different costs of living, have the right to receive pay having the same purchasing power.  This right is enforceable by a federal district court as a matter of federal common law, provided the court has jurisdiction, as it does in this case pursuant to one or more of the following statutes:  5 U.S.C. § 7702, 28 U.S.C. § 1361, 28 U.S.C. § 1367, and 28 U.S.C. § 1331.

(c)     The right to receive pay of equal value for work of equal value is not based on position-to-position comparisons, and a violation of the right cannot be established by such comparisons.  The mandate is satisfied when, and only when, salary levels are harmonized with living costs on a regional basis.  This means simply that salaries for a given job level must be higher in regions (non-foreign areas or locality pay areas) with higher living costs, and lower in regions with lower living costs. Maintaining this proportionality is essential to pay equity as long as living costs vary substantially from region to region.

(d)     Inter-regional alignment of salaries and living costs can be, and is being, achieved within the contiguous United States by the locality pay program, which is based on measured differences in non-federal salaries from one locality pay area to another.  Salaries are proportional to living costs in these contiguous areas.  However, non-federal salaries are not a suitable indicator of living costs in non-foreign areas.

(e)    Pay equity in COLA areas can be easily achieved – temporarily or permanently – by means of a simple formula utilizing the COLA rates calculated (by OPM) for purposes of calibration.  For example, in 2009, COLA rates in the various non-foreign areas ranged from 14% to 25%, indicating how much higher the living costs in COLA areas were during that year than living costs in the Washington D.C. area.  The mandate of pay equity for federal employees in a given COLA area is clearly not satisfied if salaries for jobs in the COLA area are less than salaries for the same jobs in the lower-cost environs of Washington D.C.  Salaries in COLA areas should be higher, not lower, than salaries in the District of Columbia.  COLA rates and supporting data can be used to calculate how much higher.

(f)    Defendants are in possession of a wealth of COLA program data for the period from October 1, 2000, when the COLA methodology as completely reformed to the satisfaction of all parties pursuant to the *Caraballo* settlement became effective, until January 1, 2010, when the COLA program was discontinued pursuant to the 2009 Act and COLA rates no longer reflected the differences in living costs between COLA areas and the Washington D.C. areas.  Now, OPM intends to disregard and make no further use of this large database, relying instead on an inappropriate locality pay methodology, designed for the economy of the contiguous United States, to determine federal salary levels in the distant and unique non-foreign areas.  The Agency's nonfeasance violates basic principles of administrative law as well as statutory prohibitions against discrimination within the federal workforce.

## CLAIMS FOR SPECIFIC ENFORCEMENT

66.     Pursuant to Section 6 of the Administrative Procedure Act, 5 U.S.C. § 706, which directs the Court to "compel agency action unlawfully withheld or unreasonably delayed," and 28 U.S.C. § 1361, which provides that "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff," Plaintiffs hereby request the Court to enter an order requiring the following steps to be taken and changes to be made by Defendants with respect to each member of the class:

(a)     Correction of all pay records and retirement accounts so as to include, as part of base pay and basic pay, all COLA payments, and thereby to increase "average pay" and the amounts of annuities payable to retirees and surviving spouses, such corrections to show the annuity amounts paid and remaining unpaid, by year;

(b)     As of an effective date after the issuance of the order, changes in benefit payment procedures to ensure that all subsequent payments of the retirement annuity and other benefits will be made in the increased amounts indicated by the corrected records and accounts;

(c)     Payment, from the Civil Service Retirement and Disability Fund, of a lump sum equal to (i) the aggregate of all amounts by which payments of the retirement annuity and other benefits prior to the effective date were less than the amounts indicated by the corrected records and accounts, plus (ii) interest earned or saved by Defendants as a result of their retention of unpaid amounts, to the date of payment;

(d)     As of an effective date after the issuance of the order, increases in locality pay rates or GS pay rates, or both, in COLA areas, so that employees in each area thereafter will receive pay having value equal to the value of pay received by employees performing the same or similar work in the contiguous United States; and

(e)     Calculation of a lump sum equal to (i) the aggregate of all amounts by which salary payments prior to the effective date were less than required for pay equality, plus (ii) interest to the effective date, calculated in the manner provided by 5 U.S.C. § 5596.

67.     The corrections of pay records and retirement accounts pursuant to sub-paragraph 66(a) must include a recalculation by Defendants of the annuity originally due to each class member who retired before the effective date specified in sub-paragraph 66 (b), based on the rules for calculating annuities that were in effect on the date of retirement, and a recalculation of each periodic increase to the original amount (based on nation-wide increases in the cost of living).  For purposes of the restitution required by sub-paragraph 66(c), Defendants should be ordered to cooperate with Plaintiffs in developing an appropriate formula for calculating the interest earned or saved by Defendants as a result of their unlawful retention of the unpaid annuity amounts.

68.     Also, for purposes of sub-paragraph 66(d) and (e) Defendants should be ordered to cooperate with Plaintiffs in developing an appropriate formula, utilizing data from periodic price surveys conducted by OPM for purposes of setting COLA rates, to determine the salary levels needed for pay equality in non-foreign areas at relevant times in the past and future.  The formula can be used for purposes of a temporary injunction to ensure pay equality in each COLA area going forward, and the same

formula can be used to calculate the amounts of back pay and interest that are due (pursuant to the Back Pay Act, 5 U.S.C. § 5596) to employees in each COLA area on account of salary discrimination in the past.  The injunction should remain in effect until such time as OPM can demonstrate, to the satisfaction of the Court, an alternative method for ensuring pay equality in non-foreign areas and has implemented such method by lawful regulation.

## CAUSES OF ACTION:  ANNUITY CLAIMS

69.     Plaintiffs incorporate paragraphs 22-24, 52-58, 66(a)-(c), and 67 of this complaint, above, into the following Counts One and Two, as if set forth in full therein.

### Count One:  Declaratory Judgment

70.     Each named Plaintiff, each member of the class, and each Defendant, is an "interested party" within the meaning of that term in 28 U.S.C. § 2201(a).

71.     An actual, genuine, and justiciable controversy exists between Plaintiffs and Defendants concerning the above mentioned matters and unlawful acts.   The controversy is appropriate for resolution pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§2201 *et seq.* (the "DJA"), and Rule 57 of the Federal Rules of Civil Procedure.

72.     Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a judgment declaring their rights.  In addition, pursuant to 28 U.S.C. § 2202, Plaintiffs are entitled to further necessary or proper relief based upon the declarations of this Court.

73.     Plaintiffs request that the Court enter the declarations, findings, conclusions and judgments contained in paragraphs 52-58 above.

**Count Two:  Administrative Procedure Act**

74.     Section 6 of the Administrative Procedure Act, 5 U.S.C. § 706 (the "APA"), directs the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; . . . or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."

75.     Plaintiffs have suffered and are suffering a legal wrong and are adversely affected and aggrieved, as those terms are used in 5 U.S.C. § 702, by each of the Agency actions of which they complain herein.

76.     Plaintiffs are entitled, under the APA, to the declarations, findings, conclusions, orders of specific performance, and judgments contained in paragraphs 52-58, 66(a)-(c), and 67 above.

**CAUSES OF ACTION:  SALARY CLAIMS**

77.     Plaintiffs incorporate paragraphs 25-30, 52, 59-65, 66(d)-(e), and 68 of this complaint, above, into the following Counts Three and Four, as if set forth in full therein.

**Count Three:  Declaratory Judgment**

78.     Plaintiffs incorporate paragraphs 70-72 of this complaint into this Count Three, as if set forth in full herein.

79.   Plaintiffs request that the Court enter the declarations, findings, conclusions and judgments contained in paragraphs 59-65 above.

**Count Four:  Administrative Procedure Act**

80.   Plaintiffs incorporate paragraphs 74-75 of this complaint into this Count Four, as if set forth in full herein.

81.   Plaintiffs are entitled, under the APA, to the declarations, findings, conclusions, orders of specific performance and judgments contained in paragraphs 59-65, 66(d)-(e), and 68 above.

**CAUSES OF ACTION:  DISCRIMINATION CLAIMS**

**Count Five:  Violations of 42 U.S.C. § 2000e-16**

82.   Plaintiffs incorporate paragraphs 22-30 and 52-68 of this complaint into this Count Five, as if set forth in full herein.

83.   The federal employees who work in the non-foreign areas are disproportionately  African American, Hispanic, Alaska Native, Native Hawaiian, and/or Asian.

84.   The impact of these practices and rules has a disproportionately negative impact on racial and ethnic minorities, as described elsewhere herein.  Defendant OPM knew and understood that its decisions would have a disparate and extremely adverse impact on members of protected minority groups and, upon information and belief, intended that discriminatory impact.

85.   There is no business or national interest that justifies the negative disparate impact of these practices and rules.

86.     Therefore, Plaintiffs are entitled to all actual, general, special, incidental, statutory, punitive, and consequential damages as a result of this unlawful discrimination, as well as any declaratory or injunctive relief necessary to end the discriminatory impact of these policies and rules.

## PRAYER FOR RELIEF

87.     Plaintiffs, on behalf of themselves and the class, hereby pray for the following relief:

(a)     An order certifying this case as a class action;

(b)     A declaration that the exclusion of COLA from "basic pay" for purposes of the retirement annuity and other benefits is unlawful and void;

(c)     A permanent injunction prohibiting Defendants from excluding COLA from the retirement base of federal employees in non-foreign areas;

(d)     An order requiring Defendants to pay, from the Civil Service Retirement and Disability Fund, to a trustee for distribution in accordance with an order of the Court, (a) the aggregate amount by which the retirement annuities of any and all class members have been underpaid as a result of the unlawful exclusion of COLA from the retirement base, plus (b) interest earned or saved by Defendants as a result of their retention of unpaid amounts, to the date of payment, and such other costs as may be awarded by the Court;

(e)     In the alternative, an order requiring Defendants to pay, from the Civil Service Retirement and Disability Fund, to each living class member and to any lawfully entitled representative, successor, or assign of a deceased class member, (a) the aggregate amount by which the retirement annuities of the class member have been

underpaid as a result of the unlawful exclusion of COLA from the retirement base, plus (b) interest earned or saved by Defendants as a result of their retention of unpaid amounts, to the date of payment, and such other amounts as may be awarded by the Court;

(f)     A declaration that OPM has the power and the obligation to issue regulations (a) assigning Puerto Rico, the U.S. Virgin Islands, Guam, and the Northern Mariana Islands (and certain other non-foreign areas that are not eligible for COLA) to an appropriate locality pay area other than RUS, which area may be specified in the declaration, and (b) making appropriate adjustments in locality pay methodology as applied to any or all non-foreign areas, which adjustments may be specified in the declaration;

(g)     A declaration that OPM has the power to issue regulations authorizing special rates of GS pay for non-foreign areas and the obligation to do so, instead of or in addition to the changes in locality pay areas and methodology described above;

(h)     An order requiring increases in locality pay rates or GS pay rates, or both, in all COLA areas, as of an effective date, so that employees in each area thereafter will receive pay having value equal to the value of pay received by employees performing the same or similar work in the contiguous United States;

(i)     An order requiring Defendants to cooperate with Plaintiffs in producing a stipulation, for the approval of the Court, that sets forth: (a) an appropriate formula, utilizing data from periodic price surveys conducted by OPM for purposes of setting COLA rates, and from other sources, to determine the salary levels needed for

pay equality in non-foreign areas at relevant times in the past and future; and (b) a report showing, for each class member, the aggregate amount by which the regular salary of the class member was underpaid, in relation to the amounts or adjustments needed for pay equality as specified in the declarations and orders of the Court, during all pay periods prior to the effective date specified in the order issued pursuant to Prayer for Relief (g) above, plus interest to such date at the rates specified in the Back Pay Act;

(j)     An award of attorneys fees and costs in favor of Plaintiffs and against Defendants; and

(k)     Such other relief, at law or in equity, as is deemed just and equitable by the Court.

## DEMAND FOR JURY TRIAL

88.     Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby demand a jury trial on all issues so triable.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico this 11th day of March, 2014.

*s/ Arturo J. García Solá*
USDC-201903
ajg@mcvpr.com

*s/ Francisco G. Bruno*
USDC-117011
fgb@mcvpr.com

*s/ Raúl M. Arias*
USDC-209706
rma@mcvpr.com

MCCONNELL VALDES LLC
PO Box 364225
San Juan, Puerto Rico 00936-4225
270 Muñoz Rivera Avenue
Hato Rey, Puerto Rico  00918
Tels. (787) 250-5632/5608/2604
Fax: (787) 759-2785/2776/2772

*Attorneys for Plaintiffs*

Of Counsel for Plaintiffs:

Robert G. Mullendore
ROBERT G. MULLENDORE, P.S.
310 West Spruce Street
Missoula, MT  59802

Kevin A. Rames
LAW OFFICES OF K. A. RAMES, P.C.
Suite 3, 2111 Company Street
Christiansted, St. Croix
U.S. Virgin Islands 00820

David C. Smith
KILPATRICK TOWNSEND & STOCKTON, LLP
607 14th St., N.W. Suite 900
Washington, D.C. 20005

Robert K. Baldwin
GOETZ, BALDWIN & GEDDES P.C.
35 North Grand
Bozeman, MT  59771