**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

---

| | |
|---|---|
| ROSA CARMINA RODRIGUEZ, ALEXIS E. AGOSTINI, RAYMOND U. ARROYO, CARL C. CHRISTENSEN, ERNESTO L. CRUZ, MANUEL Q. CRUZ, SHIRLEY Y. M. CUMMINS, LINDA T. KUAILANI, ROY LYNCH, RAFAEL A. MARTINEZ, ALBERT E. MILLER, JULIA Q. NORMAN, HILDAMAR ORTIZ, REGINALD KENALIO PUANA, IVAN O. PUIG, CYNTHIA JEAN ROMNEY, VICTOR L. ROSARIO, CELIA A. RUIZ, and JOEL A. TUTEIN; <br><br> for themselves, and on behalf of all persons similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> The UNITED STATES OF AMERICA, the U.S. OFFICE OF PERSONNEL MANAGEMENT, and KATHERINE ARCHULETA, Director of the U.S. Office of Personnel Management, <br><br> Defendants. | Case No. 3:14-cv-01193-NT-JHR <br><br><br> **AMENDED** <br><br> **CLASS ACTION COMPLAINT** <br><br> **AND DEMAND FOR JURY TRIAL** |

---

## CLASS ACTION COMPLAINT

Plaintiffs, by and through their undersigned counsel, on behalf of themselves and all others similarly situated, state and allege as follows:

## PARTIES

### Plaintiffs

1.     Plaintiffs, and all other members of the class defined below, (a) are, were, or will

be employed by the United States, or by its agencies, instrumentalities, and corporations, in one or more of the following areas: Puerto Rico, the U.S. Virgin Islands, Guam, the Northern Mariana Islands, Hawaii, and Alaska (called "COLA areas"), or (b) are, were, or will be a surviving spouse of such an employee.  The COLA areas are among the "non-foreign areas" of the United States, although the two terms are sometimes used interchangeably.  All class members in group (a) receive or received a cost-of-living allowance ("COLA") pursuant to Executive Order 10000 and applicable statutes and regulations.  Plaintiffs bring this action for themselves and on behalf of all past, present, and future federal employees in COLA areas and the surviving spouses of such employees.

2.    Rosa Carmina Rodriguez is a citizen of the United States and a resident of Puerto Rico.  She is employed by the United States Department of Housing and Urban Development in San Juan, Puerto Rico.  She is Hispanic and African-American and has experienced continuing losses as a result of the unlawful and discriminatory practices of The United States Office of Personnel Management ("OPM").  She also will incur further losses, in terms of her annuity payments, after she retires.

3.    Alexis E. Agostini is a citizen of the United States and a resident of Puerto Rico. He was formerly employed by the United States Department of Agriculture in Puerto Rico.  He is Hispanic and has experienced losses as a result of OPM's unlawful and discriminatory practices.  He is retired and has incurred continuing further losses in terms of his annuity payments.

4.    Raymond U. Arroyo is a citizen of the United States and a resident of Guam.  He was employed by the United States Department of the Navy in Guam.  He is Hispanic and a Pacific Islander (Chamorro) and has experienced losses as a result of OPM's unlawful and

discriminatory practices.  He is retired and has incurred continuing further losses in terms of his annuity payments.

5.      Carl C. Christensen is a citizen of the United States and a resident of the U.S. Virgin Islands.  He is employed by the U.S. Small Business Administration in the U.S. Virgin Islands.  He is African-American and has experienced continuing losses as a result of OPM's unlawful and discriminatory practices.  He also will incur further losses, in terms of his annuity payments, after he retires.

6.      Ernesto L. Cruz is a citizen of the United States and a resident of Puerto Rico.  He is employed by the United States Department of Housing and Urban Development in San Juan, Puerto Rico.  He is Hispanic and has experienced continuing losses as a result of OPM's unlawful and discriminatory practices.  He will also incur further losses, in terms of his annuity payments, after he retires.

7.      Manuel Q. Cruz is a citizen of the United States and a resident of Guam.  He was employed by the United States Department of the Navy in Guam.  He is Hispanic and a Pacific Islander (Chamorro) and has experienced losses as a result of OPM's unlawful and discriminatory practices.  He is retired and has incurred continuing further losses in terms of his annuity payments.

8.      Shirley Y.M. Cummins is a citizen of the United States and a resident of Hawaii.  She was employed by the United States Department of the Navy in Hawaii.  She is Asian and has experienced losses as a result of OPM's unlawful and discriminatory practices.  She is retired and has incurred continuing further losses in terms of her annuity payments.

9.      Linda T. Kuailani is the surviving spouse of Francis Kuailani Sr.  Francis was employed by the Department of the Interior in Hawaii and retired before his death.  Francis was a

Native Hawaiian and experienced losses as a result of OPM's unlawful and discriminatory practices. OPM's unlawful and discriminatory practices continue to impose losses upon his surviving spouse, Linda. Linda is Asian.

10.     Roy Lynch is a citizen of the United States and a former resident of the U.S. Virgin Islands. He was employed by the United States District Courts in the U.S. Virgin Islands. He is African-American and has experienced losses as a result of OPM's unlawful and discriminatory practices. He is retired and has incurred continuing further losses in terms of his annuity payments.

11.     Rafael A. Martinez is a citizen of the United States and a resident of Puerto Rico. He was employed by the United States Bureau of Alcohol, Tobacco, Firearms and Explosives in Puerto Rico. He is Hispanic and has experienced losses as a result of OPM's unlawful and discriminatory practices. He is retired and has incurred continuing further losses in terms of his annuity payments.

12.     Albert E. Miller is a citizen of the United States and a resident of Hawaii. He is employed by the Federal Aviation Administration in Hawaii. He is a Pacific Islander (Native Hawaiian) and has experienced continuing losses as a result of OPM's unlawful and discriminatory practices. He also will incur further losses, in terms of his annuity payments, after he retires.

13.     Julia Q. Norman is a citizen of the United States and a resident of Guam. She is employed by the United States Department of the Navy in Guam. She is Pacific Islander (Chamorro) and has experienced continuing losses as a result of OPM's unlawful and discriminatory practices. She also will incur further losses, in terms of her annuity payments, after she retires.

14.     Hildamar Ortiz is a citizen of the United States and a resident of Puerto Rico.  She is employed by the United States Department of Housing and Urban Development in San Juan, Puerto Rico.  She is Hispanic and has experienced continuing losses as a result of OPM's unlawful and discriminatory practices.  She also will incur further losses, in terms of her annuity payments, after she retires.

15.     Reginald Kenalio Puana is a citizen of the United States and a resident of Hawaii.  He was employed by the United States Department of the Navy in Hawaii.  He is a Pacific Islander (Native Hawaiian) and has experienced losses as a result of OPM's unlawful and discriminatory practices.  He is retired and has incurred continuing further losses in terms of his annuity payments.

16.     Ivan O. Puig is a citizen of the United States and a resident of Puerto Rico.  He was employed by the United States Postal Service in Puerto Rico.  He is Hispanic and has experienced losses as a result of OPM's unlawful and discriminatory practices.  He is retired and has incurred continuing further losses in terms of his annuity payments.

17.     Cynthia Jean Romney is a citizen of the United States and a resident of the U.S. Virgin Islands.  She was employed by the United States District Courts in the U.S. Virgin Islands.  She is African-American and has experienced losses as a result of OPM's unlawful and discriminatory practices.  She is retired and has incurred continuing further losses in terms of her annuity payments.

18.     Victor L. Rosario is a citizen of the United States and a resident of Puerto Rico.  He was employed by the United States Office of Personal Management in Puerto Rico.  He is Hispanic and has experienced losses as a result of OPM's unlawful and discriminatory practices.  He is retired and has incurred continuing further losses in terms of his annuity payments.

19.     Celia A. Ruiz is a citizen of the United States and a resident of Puerto Rico.  She was employed by the United States Department of Housing and Urban Development in San Juan, Puerto Rico.  She is Hispanic and has experienced losses as a result of OPM's unlawful and discriminatory practices.  She is retired and has incurred continuing further losses in terms of her annuity payments.

20.     Joel A. Tutein is a citizen of the United States and a resident of the U.S. Virgin Islands. He is employed by the United States National Park Service in the U.S. Virgin Islands. He is African-American and has experienced continuing losses as a result of OPM's unlawful and discriminatory practices.  He also will incur further losses, in terms of his annuity payments, after he retires.

### Defendants

21.     In this Complaint, the term "United States" refers to the employer of all class members in group (a), or, depending on context, to the geographical area comprised of the non-foreign areas (as defined in 5 C.F.R. § 591.205) and the contiguous forty-eight states.  The Office of Personnel Management, or OPM, is an agency of the United States, of which Defendant Katherine Archuleta is Director, and is responsible for calculating and paying annuities to retired federal employees, providing other employment benefits, setting COLA rates, and administering other civil service programs, all in accordance with applicable laws.  As used hereafter in this Complaint, "Agency" refers to either OPM or its predecessor, the Civil Service Commission, as the context dictates.  The United States, the Agency, and Director Archuleta are collectively referred to as "Defendants."

### SUMMARY OF THE CASE

22.     The Agency has unlawfully excluded COLA from measures of "basic pay" and

- 6 -

"base pay" used for calculating certain benefits to which, as federal employees, the plaintiffs are entitled, including the federal retirement annuity, federal life insurance benefits, and contributions to the Thrift Savings Plan. Such measures are sometimes called the "retirement base".   The Agency's exclusion of COLA from the retirement base (hereafter called the "exclusionary rule") consists of practices and regulations that are contrary to the intent of Congress and the President and beyond the authority of the Agency.   The Agency has implemented and followed the exclusionary rule without explanation or opportunity for comment.  The exclusionary rule has no rational basis, is arbitrary and capricious, was intended to and does discriminate against and has an adverse impact on protected minorities in violation of 42 U.S.C. § 2000e-16 and 5 U.S.C. § 2302(b), and violates the legal mandate of equal pay for equal work throughout the federal workforce.  The Agency's practice of excluding COLA is an unlawful act each and every time a plaintiff receives an annuity payment or a paycheck that takes the exclusion into account.   For each of these reasons, collectively or alternatively, the exclusionary rule is null and void.

23.     Today, federal employees in COLA areas are the only class of federal employees in the United States whose regular compensation for normal working hours in their place of permanent residence is discounted in the calculation of their retirement annuities, *i.e.*, not entirely included in their retirement base.  On the other hand, the costs of living in COLA areas are among the highest in the nation.  Considering both sides of the picture, *i.e.* lower annuity payments combined with higher living costs, federal retirees in non-foreign areas are enduring extreme hardships during the last years of their lives.  These hardships are not faced by federal retirees anywhere else in the United States.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

24.     On February 12, 2013, Plaintiffs delivered to OPM at its Washington D.C. office a comprehensive set of documents that included and explained the charges of unlawful miscalculation of annuities and unlawful and intentional discrimination set forth in this Complaint.   Plaintiffs had attempted to bring these claims to OPM's attention previously, but OPM was consistently nonresponsive.  Consistent with OPM's previous lack of responsiveness, OPM refused to respond to the charges delivered on February 12, 2013.

25.     In light of OPM's refusal to respond to these charges, on March 25, 2013, Plaintiffs sent a letter (via courier) to OPM, requesting "counseling" pursuant to 29 C.F.R. § 1614.105 and 29 C.F.R. § 1614.204(b).  This request was repeated in an email sent to the EEO office of OPM on March 26, 2013.   The Agency acknowledged receipt and the counseling process occurred.

26.     On April 19, 2013, OPM sent Plaintiffs' attorney a letter requesting an extension of the counseling period, and a 30-day extension was allowed.

27.     On May 17, 2013, OPM issued a Final Interview Letter that terminated counseling and authorized the filing of a formal EEO complaint with the Agency.  In an email transmitting the letter, Yasmin Rosa, Senior EEO Specialist and Informal Complaints Manager for OPM, stated: "The inquiry into the allegations brought forth by you and your associates on behalf of Ms. Rodriguez, Class Agent, has been completed.  I spoke with management officials and communicated the claims raised by the class.  Management's response into the allegations of discrimination was that the issues are a matter of law and the '*statutes allow for no discretion on the part of OPM.  In the absence of discretion, there can be no improper discrimination.*'" (emphasis in original).

28.    On May 31, 2013, each of the named Plaintiffs filed with OPM a document in the form prescribed by OPM entitled "OPM Formal EEO Complaint."  The formal complaints were accompanied by extensive addenda detailing the claims of intentional discrimination and the related claims arising under other laws as described in paragraphs 22 through 23 above.  In addition, on June 3, 2013, Plaintiff Rosa Rodriguez (recognized by OPM as the lead agent for the class) filed a comprehensive Memorandum in support of the formal complaints.

29.    On June 19, 2013, OPM sent to the Equal Employment Opportunity Commission ("EEOC") (via courier) a copy of the formal complaint filed by Plaintiff Rosa Rodriguez, together with the EEO counselor's report and, as stated in the cover letter from OPM to EEOC, "all other relevant documentation."

30.    To date, OPM has not issued a decision or otherwise resolved the matter as directed by 5 U.S.C. § 7702(a)(2).  The EEOC did, however, through Mary Jo Mosca, Administrative Judge, issue an "Acknowledgement and Order for Class Certification" that was served by mail upon Ms. Rodriguez and her counsel on January 15, 2014, in which EEOC acknowledged that the proceeding had been brought as a "class complaint."  Plaintiffs responded to that order by their Statement In Support Of Class Certification dated January 31, 2014. However, more than 120 days have elapsed since Plaintiffs filed their formal complaints. Accordingly, Plaintiffs are entitled by 5 U.S.C. § 7702(e)(1) to bring this case in federal district court.

31.    In addition, each and every member of the class has exhausted his or her administrative remedies, by virtue of the fact that Plaintiffs, through Ms. Rodriguez as class representative, requested that OPM adjudicate their claims (which OPM refused to do), submitted an EEO Informal Complaint, began informal counseling, received a Final Interview

letter, and within 14 days filed a Formal EEO Complaint that was not resolved within 120 days.

32.    In the alternative, the exhaustion requirement is waived, by operation of law, as to any and all class members who have not exhausted their administrative remedies, whether or not they are named class representative:

A.    Under the "single filing exception" to the exhaustion requirement;

B.    Because the purpose of administrative exhaustion, *i.e.*, notice to the Agency, has been fulfilled;

C.    Because another purpose of administrative exhaustion, to create a factual record for appellate review, is not necessary in this case because Plaintiffs' claims are based on system-wide violations and questions of statutory interpretation which are collateral to individual benefit determinations, *i.e.*, there is nothing to be gained from compiling a further factual record about the individual claimants because the legitimacy of the challenged policy does not depend upon the particular facts pertaining to any particular claimant;

D.    Because another purpose of administrative exhaustion, reliance on agency expertise, is unnecessary and inappropriate in this case because OPM has no particular expertise in matters of statutory interpretation, which is the province of the courts;

E.    Because such administrative claims would be futile in light of OPM's position that it is statutorily barred from granting the relief that Plaintiffs request, and no valid purpose would be served by requiring each and every class member to file and prosecute an individual administrative claim;

F.     Because such administrative claims would also be futile in light of agency conflicts of interest, *i.e.*, OPM cannot impartially adjudicate Plaintiffs' claims because they are based on OPM's alleged misconduct; and

G.     Because the class members would be irreparably harmed by the expense and delay caused by forcing them to engage in the futile act of filing individual administrative claims.

## JURISDICTION AND VENUE

33.    The Court has jurisdiction over this "mixed case" under one or more of the following statutes:  5 U.S.C. § 7702, 28 U.S.C. § 1361, 28 U.S.C. § 1367, and/or 28 U.S.C. § 1331.

34.    In the alternative to "mixed case" jurisdiction, the Court has jurisdiction over this matter to the extent that Plaintiffs do not challenge, or are not entitled to, any individual benefit determinations or awards of back pay, and do not otherwise bring claims governed by the Civil Service Retirement Act ("CSRA"), but instead seek prospective declaratory and injunctive relief as to an Agency regulation with system-wide application.  The class members have not been made aware of the challenged system-wide policy, or its effects on their annuity calculations, because OPM failed to comply with notice-and-comment procedures and failed to notify them of their right of appeal in accordance with 5 C.F.R. 2012.21.  OPM's failure to provide Plaintiffs with such notice further indicates that the challenged policy is not an appealable employment decision within the contemplation of the CSRA.  A challenge to such an undisclosed and system-wide interpretive rule falls within the original jurisdiction of the federal district courts.  Plaintiffs' claims can be meaningfully addressed by this Court, and meaningful judicial review cannot be obtained through the CSRA or other administrative processes.

- 11 -

35.     Venue is proper in this district pursuant to one or more of the following statutes: 5 U.S.C. § 7703(b)(2), 42 U.S.C. § 2000e-5(f)(3), and/or 28 U.S.C. § 1391(e).

## CLASS ACTION ALLEGATIONS

36.     Plaintiffs bring this action on their own behalf, and on behalf of a class of all similarly situated individuals, pursuant to Rules 23(a), 23(b)(1), 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure.

### Class Definition

37.     The class in this case consists of (a) all persons whose regular salaries as federal employees currently include, or did in the past include, or will in the future include, amounts "based on living costs substantially higher than in the District of Columbia" that are paid pursuant to Section 207 of the Independent Offices Appropriations Act, Chap. 219, Sec. 207, 62 Stat. 176, 194 (April 20, 1948), as amended by Chap. 775, Sec. 207, 62 Stat. 1196, 1205 (June 30, 1948), or any codification of Section 207, and pursuant to Executive Order 10000 (September 16, 1948), as amended from time to time, and (b) all persons who are now, or were in the past, or become in the future, a surviving spouse of such an employee.

38.     In this class definition, the term "federal employees" includes all persons employed by the United States or by an agency, establishment, or instrumentality thereof, or by a corporation owned by the United States, including employees of the United States Postal Service, the Administrative Office of the United States Courts, the General Accounting Office, and Non-Appropriated Fund agencies.

### Class Action Criteria

39.     There are in excess of 100,000 class members.  Joinder of all class members is

therefore impracticable.

40.     The claims of the named Plaintiffs are typical of those of all members of the class.

41.     The questions of law and fact that are presented by the named Plaintiffs are applicable in common to all class members.

42.     The individual named Plaintiffs are members of the class and represent a variety of classifications and agencies, and they will be able fairly and adequately to represent and protect the interests of the class.  They have retained counsel who are experienced in class action litigation and litigation against the United States, including class actions involving the COLA program.

43.     The class is large in number and widely dispersed.  The prosecution of separate actions by fewer than all members of the class would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, and that would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

44.     Defendants have acted or failed to act on grounds generally applicable to the class, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole.  The same formula will be used to correct the payroll and accounting records of all class members.  Amounts due for underpayment of annuities will appear in these corrected records, and precise payments of benefits can be made in accordance with the judgments and orders of the Court.  If any facts or records are needed for the Court's decisions, they are in the possession of Defendants and are readily accessible.

45.     Common questions of law or fact predominate over any question affecting any individual member of the class.  It would be financially impractical, if not impossible, for class

members to prosecute their claims on an individual basis in non-class suits.  A class action is the only available means for the fair and efficient adjudication of this matter.

## CLAIMS FOR DECLARATORY JUDGMENT

46.    Defendants' actions of which Plaintiffs complain are unlawful or otherwise invalid, both procedurally and substantively, for the reasons stated elsewhere herein.  Pursuant to Section 6 of the Administrative Procedure Act, 5 U.S.C. § 706, which directs the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; . . . or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court,"  and pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, which authorize the Court to declare the rights and obligations of the parties and to issue declaratory judgments, Plaintiffs hereby request the Court to enter the declarations, findings, conclusions, and judgments contained in the following paragraphs 47 through 84.

**Congress and the President intended to include COLA in the retirement base,
and the Agency's contrary exclusionary rule is null and void.**

47.    Congress enacted Section 207 of the Independent Offices Appropriations Act on April 20, 1948, to standardize the purposes and rates of additional compensation already being paid by longstanding administrative practice to federal employees stationed outside the contiguous United States.  The section (as clarified two months after it was enacted) specified two separate grounds for paying such compensation, either:

A.    "[L]iving costs substantially higher than in the District of Columbia;" or

B.    "[C]onditions of environment which differ substantially from conditions

- 14 -

of environment in the States and warrant additional compensation as a

recruitment incentive;"

and set a maximum rate of 25% in both cases.  The section authorized the continuation of such

additional compensation "only in accordance with regulations prescribed by the President."

48.     In Section 207, as clarified, Congress used the term "additional compensation,"

and not the term "allowance," to describe the pay component paid (outside the contiguous United

States) as an addition to the standard component provided to all federal employees by the

Classification Act of 1923, as amended.  The standard component is now called "GS" pay.  The

additional compensation was usually called a "salary differential" (or sometimes a

"compensation differential" or a "25 percent differential" or just a "differential").  In the report

of the House Appropriations Committee on Section 207, it was called a salary differential—not

an allowance.  *See* House Report 80-1288, January 30, 1948.  By widespread practice, the salary

differential was considered part of the base pay for the position.  It was included with the

standard component in payroll records.   The combined amount was used for calculating

retirement deductions, overtime pay, and other purposes.

49.     In enacting and clarifying Section 207, Congress did not intend to change the

practice of including the salary differential in the base used for calculating retirement deductions

and annuities.  Previous statutes had specifically excluded other pay components from the

retirement base when that was the intention of Congress, *e.g.*, a 1944 statute specifying that

severance pay "shall not be regarded, except for purposes of taxation, as salary or compensation

and shall not be subject to retirement deductions" 58 Stat. 845.  Congress did not do so in

Section 207.  If Congress had intended to effect a change in federal retirement benefits, and

specifically the well-accepted practice of including the "salary differential" in base pay for

purposes of calculating retirement benefits, Congress would have said so.  There is no evidence of any such intent.  On the contrary, by using the term "cost-of-living allowance" in Section 207 to refer to additional compensation payable to U.S. citizens working on temporary assignments in foreign countries, and by carefully avoiding the term in reference to additional compensation paid to federal employees residing permanently in non-foreign areas, based on the high costs of living in those areas, Congress demonstrated its understanding that the latter is in fact a salary differential, as it had always been called, not an allowance within the meaning of the retirement laws, and that it would continue to be included within the retirement base.

50.     On September 16, 1948, President Truman issued Executive Order 10000 to give effect to the difference between living costs and environmental conditions as the basis for paying higher salaries outside the contiguous United States, as specified by Congress.  In Section 208(b) of the Executive Order, President Truman excluded from the base for retirement purposes additional compensation based on environmental conditions (a "post differential"), but additional compensation based on living costs (*i.e.* COLA) remained included.  The President clearly intended COLA to be treated differently from a post differential.  There are good reasons for this distinction, as explained below.  Executive Order 10000 was amended in 1985 to replace the word "Territorial" with the phrase "Non-foreign area," but otherwise Section 208(b) remains unchanged to this day.

51.     The primary purpose of a post differential is to attract qualified non-residents to work in a non-foreign area where there are extraordinarily difficult living conditions, excessive physical hardships, or notably unhealthful conditions (the following non-foreign areas are eligible for post differential but not COLA: American Samoa, Johnston Atoll, Midway Atoll, and Wake Atoll).  The recruit is expected to come from some other place (including a COLA area)

and to return to a permanent residence upon retirement or completion of the tour of duty.  A post differential is intended to compensate for temporary needs that will not continue during retirement.  For this reason, President Truman considered it inappropriate to include the temporary differential in the total amounts of compensation from which an average is calculated in determining the amount of the retirement annuity.

52.     By contrast, COLA is payable in Hawaii, Alaska, Puerto Rico, the U.S. Virgin Islands, Guam, and the Northern Mariana Islands "based on living costs substantially higher than in the District of Columbia."  These areas have large populations and are no less habitable than places in the contiguous United States.  In 1948 a large percentage of the federal employees in each of these areas were being recruited from within the area, and today that percentage is approaching 100%.  These employees are just as likely to remain in their place of residence after retirement as are federal employees in the contiguous United States.  In fact, employees in trans-oceanic COLA areas have far less ability to relocate after retirement than do employees in the contiguous United States.  Federal employees in COLA areas are not expected to "return home" at some point because *they are already home*.  Congress and President Truman understood this in 1948, and so it remains today.

53.     The distinction drawn by President Truman between temporary and permanent posts in non-foreign areas in Section 208(b) of the Executive Order is exactly like the distinction drawn by Congress between foreign and non-foreign posts in Section 207 of the 1948 Act.  The need for additional compensation to employees on temporary assignment in foreign or non-foreign areas will not continue during retirement.  Employees who permanently reside in COLA areas, on the other hand, cannot hope to have the same standard of living during retirement as employees doing the same work in the contiguous United States, if (as occurs under OPM's

- 17 -

exclusionary rule) a large part of their regular salaries is excluded from the base for calculating annuities while the regular salaries of all other employees are fully included.

54.     Congress and the President specifically intended COLA to be included in the retirement base, just as amounts paid to employees in the non-foreign areas to compensate for higher living costs had previously been treated.  The entire salary of a GS employee in a COLA area, including the COLA component, itself, is "fixed by law or regulation" and therefore constitutes "the base pay of the position" as those terms have been used in the retirement statutes since 1920.  Accordingly, COLA must be counted in calculating the annuity.  This was the understanding of agencies paying COLA before 1948 (when it was called a salary differential), and it was the understanding of Congress and the President when they acted in 1948 to standardize the rates and purposes of additional compensation in foreign and non-foreign areas.  Moreover, this is the only conclusion that is consistent with all of the statutes enacted by Congress since 1948 to govern the rules and policies of the civil service.

55.     For these reasons, among others, the regulations and practices of OPM and its predecessor that purport to exclude COLA from the base for retirement and other purposes are contrary to the understanding and intention of Congress and the President, are in excess of the Agency's statutory power and discretion, and are null and void.  The Court is directed by 5 U.S.C. § 706 to hold unlawful and set aside these unlawful rules, and declare that Congress and the President intended to include COLA in the retirement base, and the Agency's exclusionary rule is null and void.

### The Agency's exclusionary rule is procedurally null and void.

56.     The Agency has never provided notice and opportunity for comment on any rule (regulation or practice) excluding COLA from the base for retirement and other purposes, or on

the continuation or modification of any such rule.  On the contrary, scrutiny by affected employees and agencies has been discouraged by false and misleading comments by the Agency that were published from time to time in connection with other regulations.

57.    On December 30, 1948, shortly after Executive Order 10000 was issued by President Truman, the Civil Service Commission published a set of implementing regulations in the Federal Register that by their terms were to become effective on January 1, 1949.  13 Fed. Reg. 8725, 8727.  The Agency did not, either in the Federal Register notice or previously, seek comments from affected employees or agencies.  Given the very short time period between publication and the effective date of these regulations, it is highly unlikely that the regulations came to the attention of employees or Agency managers in non-foreign areas.

58.    The new regulations obliterated the important distinction between COLA and post differentials that President Truman had drawn in Section 208(b) of the executive order.  The regulations stated:  "Neither a territorial post differential nor a territorial cost-of-living allowance shall be included in the base used in computing overtime pay, night differential, holiday pay, retirement deductions, or any other additional compensation, allowance, or pay differential."  5 C.F.R. § 350.6(f); 13 Fed. Reg. 8725, 8727.  The regulations also cited a letter from the Commissioner of Internal Revenue for the proposition that both forms of additional compensation are subject to federal income tax.  5 C.F.R. § 350.6(h); 13 Fed. Reg. 8725, 8727.

59.    Upon information and belief, the Civil Service Commission was cognizant of the difference intended by President Truman between post differential and COLA for purposes of retirement, and of the absence of any intention by Congress or the President to discontinue including COLA in the retirement base, but the Agency nevertheless decided, for unlawful reasons, to commence a form of discrimination against COLA area employees that continues to

the present day.  The Agency did not, in 1948 or at any time since then, inform class members of (a) the fundamental inconsistency between its regulation and Section 208(b) of the executive order or (b) the devastating effect of the regulation on their retirement income.

60.     In subsequent years, OPM (not the Civil Service Commission) made certain changes in the language of the regulation.  The changes were increasingly adverse to employees, always issued without notice and opportunity for comment by affected employees and agencies, in violation of the Civil Service Reform Act of 1978, and were often accompanied by false and misleading statements by the Agency that were intended to, and did, discourage class members from questioning the exclusion of COLA from the base for retirement deductions and matching contributions.

61.     The regulation, first codified at 5 C.F.R. § 350.6(f), was not a discretionary exercise of rulemaking power.  The Agency has maintained the position, first expressed publicly by OPM in 2002 at 67 F.R. 22340, and at many other times, that it lacks discretion or legal authority to include COLA in the retirement base (or, of course, to exclude it).  This provision and the statement about taxation at 5 C.F.R. § 350.6(h) were unsubstantiated and incorrect predictions, for the guidance of payroll offices, of what the law would be determined to be if a case came before a court or tribunal.

62.     The Agency's prediction about taxation of COLA proved to be wrong.  Rev. Rul. 237, 1953-2 C.B. 52.  The Internal Revenue Service concluded that COLA is non-taxable, while post differential is subject to tax.  The Agency's prediction about exclusion of COLA from the retirement base is wrong as well.  Congress did not intend the difference between pay for living costs and pay for environmental conditions, so clearly expressed in Section 207 of the statute and in Executive Order 10000, to be recognized in the tax rules but ignored in the retirement rules.

- 20 -

63.     In summary, if the rule is intended as an exercise of Agency power or discretion—which OPM denies—then the Agency has failed to comply with the notice and comment requirements of the Administrative Procedure Act, and the rule is invalid for that reason.  In that case, the Court is directed by clause 2(D) of 5 U.S.C. § 706 to hold unlawful and set aside these unlawful rules, and declare that the Agency's exclusionary rule is procedurally null and void.

**The Agency's exclusionary rule is arbitrary and capricious,
and it is null and void for that additional reason.**

64.     As a result of Defendants' ongoing practice of excluding COLA from the retirement base, class members have suffered, and continue to suffer, an extreme hardship after they retire, and before they retire because of the need to save more due to an expected lower annuity.  There is no rational basis for this practice or the regulation on which it is based.  The rule is arbitrary, capricious, an abuse of discretion, and unwarranted by the facts.

65.     The Agency has never offered a policy justification for excluding COLA from the retirement base.  Since 2002, OPM has maintained the position that it lacks statutory authority to include COLA in the base because, the Agency contends, Congress intended to exclude it.  As described fully in paragraphs 76–77, *infra*, the only rationales OPM has offered for its decision to exclude COLA from the retirement base have been made in the context of lobbying for legislation and in litigation.

66.     All of the rationales which the Agency has offered for its decision are after-the-fact rationales and none of them are entitled to deference.  Each of them is a pretext.  As described full elsewhere, *see infra* paragraphs 76–77, each of them is demonstrably wrong.

67.     The intent of Congress must be determined from the then-existing circumstances and the text of Section 207 when it was enacted in 1948.  This evidence (some of which is

summarized in paragraphs 47–55 above and contained within paragraphs 76–77 below) shows that Congress, as well as President Truman, understood and intended that COLA would continue to be included in the base for retirement. The ongoing failure of OPM and its predecessor to examine and act upon this evidence is arbitrary and capricious.

68.    No public policy or valid purpose is served by excluding COLA from the retirement base. On the contrary, the Agency's exclusionary rule defeats the purpose of paying COLA, which is "to enable employees to render more complete and efficient service in carrying out their official assignments." Rev. Rul. 50-407, 1959-2 C.B. 19. The full regular salaries of employees in the contiguous United States have been included in the retirement base since 1920, and such salaries have included locality pay—functionally equivalent to COLA in every way— since locality payments began in 1994. The Agency's arbitrary practice reduces the value of COLA and of the entire salary, undermines the efficacy of the salary for the purposes Congress intended in the 1948 authorization, and violates other statutes intended to prevent exactly this kind of discrimination.

69.    Furthermore, if the Agency's rule excluding COLA from the retirement base is intended as an exercise of Agency power or discretion—which, again, OPM denies—then the rule is invalid pursuant to 5 U.S.C. § 706, clause 2(A), as well as other clauses, and the Court is directed for this additional reason to hold it unlawful and set it aside, and declare that the Agency's exclusionary rule is null and void because it is arbitrary and capricious.

**The exclusionary rule and related rules discriminate against racial and ethnic minorities, in violation of Section 717 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16.**

70.    The practice of excluding COLA from the retirement base has been followed over and over again in every payroll period, and the regulation purporting to require this practice has

been issued annually in each successive edition of the Code of Federal Regulations.  The rule is based on discriminatory intent against, and has a disparate and extremely adverse impact upon, protected minorities, which make up a large portion of the population of, and federal work-force in, the COLA areas.

71.     Upon information and belief, the majority of federal employees in each COLA area come from one or two protected minority groups.  Defendant OPM and its predecessor, the Civil Service Commission, knew and understood at all times that the rule excluding COLA from the base for computing retirement benefits and other benefits has a disparate and extremely adverse impact on members of protected minority groups.  The Agency, not Congress, intended this result.  Upon information and belief, the Agency acted with the intent to discriminate against the protected minority groups in the COLA areas.

72.     The Defendants' intent to discriminate is evidenced by at least four (4) factors:

A.     The widespread racial and ethnic stereotyping of, intentional discrimination against, and disregard for non-white minorities which the United States government has exhibited in the past, and continued to exhibit in the mid-Twentieth Century when the Agency first adopted its exclusionary rule, *see* paragraph 73, *infra*;

B.     The Defendants' historical pattern of racial and ethnic stereotyping of, and disparate treatment directed specifically toward, the minority groups in the COLA areas, *see* paragraph 74, *infra*;

C.     The extreme disparate impact that the exclusionary rule necessarily has on members of protected minority groups, *see* paragraph 75, *infra*; and

D.     The Defendants' utter failure to advance any rationale whatsoever for the

Agency's exclusionary rule for over half a century and then, only in the context of lobbying and litigation, offering excuses which are obviously false and pretextual, *see* paragraphs 76–77, *infra*.

73.    The U.S. Government has exhibited an undeniable pattern and practice of intentional discrimination, including racial and ethnic stereotyping, against non-white minorities since the country's founding.  This intentional discrimination and stereotyping was pervasive and continued throughout the early- and mid-Twentieth Century, evidenced by, among other actions:

A.    The forced deportations of people of Mexican descent between 1929 and 1939, authorized by President Herbert Hoover and carried out by the Immigration and Naturalization Service;

B.    The U.S. government's discriminatory actions taken against those of Japanese ancestry in the 1940s following the bombing of Pearl Harbor in 1941, which led, among other things, to the imposition of martial law in Hawaii from December 1941 to October 1944, the taking into custody of nearly 2,000 ethnic Japanese living in Hawaii, and the President's approval of a plan to evacuate all ethnic Japanese to the mainland "to get rid of about 20,000 potentially dangerous Japanese;"

C.    The Federal Housing Act of 1934's discriminatory rating and funding policies, which made it nearly impossible for African American and other non-white individuals to purchase homes;

D.    The Native American termination acts of the 1940s and 1950s, which terminated the recognition of tribal sovereignty, ended federal support for health care and education for Native Americans (including Native

- 24 -

Alaskans), and allowed the lands belonging to Native Americans to be taken over by the Federal Government;

E.     The "Tuskegee syphilis experiment" studying the progression of untreated syphilis on African American citizens between 1932 and 1972, recognized as "clearly racist" by President Bill Clinton, who officially apologized for the experiment in 1997;

F.     The sterilization of many African American women, without their consent, to provide medical residents with experience in performing tubal ligations and hysterectomies;

G.     The Medical College of Virginia's experiments on burn victims—most of them African American—without their knowledge or consent and with the funding and support of the U.S. Army and the U.S. Atomic Energy Commission; and

H.     The Department of Defense's funding of non-consensual whole-body radiation experiments on African American cancer patients between 1960 and 1971.

74.     This discriminatory animus and racial and ethnic stereotyping by the U.S. government in the early to mid-Twentieth Century has been (and in large part remains) particularly focused on the protected minority groups living in the non-foreign areas, as evidence by, among other things:

A.     The views, openly expressed by the citizens of the contiguous States and members of the U.S. government in the early 1900's, fueled by racism, stereotyping, and mistrust, that the white citizens of the United States were

superior to those inhabitants of the non-foreign areas,.  See, e.g., 33 Cong. Reg. 2105 (1900) (Representative Champ Clark of Missouri, speaking of Hawaiians, said "How can we endure our shame, when a Chinese Senator from Hawaii, with his pig-tail hanging down his back, with his pagan joss in his hand, shall rise from his curule chair and in pidgin English proceed to chop logic with George Frisbie Hoar or Henry Cabot Lodge."); 33 Cong. Reg. 3616 (1900) (Senator William B. Bate refers to Filipinos as "physical[] weaklings of low stature, with black skin, closely curling hair, flat noses, thick lips, and large, clumsy feet," and warns "beware of those mongrels of the East, with breath of pestilence and touch of leprosy.  Do not let them become part of us with their idolatry, polygamous creeds and harem habits."); 33 Cong. Rec. 1994 (1900) (Congressman Newlands of Nevada expressed his concern over granting citizenship to people of "islands 7,000 miles distant, of diverse races, speaking different languages, having different customs, and ranging all the way from absolute barbarism to semicivilization"); 33 Cong. Rec. 1940 (1900) (speaking of the Philippines, Representative Thomas Spight of Mississippi said, "[t]he inhabitants are of wholly different races of people from ours— Asiatics, Malays, negroes and mixed blood.  They have nothing in common with us and centuries can not assimilate them"); Simeon E. Baldwin, *The Constitutional Question Incident to the Acquisition and Government by the United States of Island Territories*, 12 Harv. L. Rev. 393, 415 (1899) (professor at Yale opines that it would be unwise "[t]o

give the … ignorant and lawless brigands that infest Puerto Rico" the benefits of the Constitution).

B.    The "Insular Cases," a line of Supreme Court decisions holding that the territories acquired by the United States were not "a part of" the United States for purposes of the application of the United States' laws and Constitution.  This line of cases has been used, for example, to refuse U.S. citizens living in Hawaii (prior to statehood) and Puerto Rico the right to indictment by grand jury and trial by jury, women's suffrage rights, and the right to vote for President, Vice President, and Congressional representatives.  For example, the 1922 opinion in *Balzac v. People of Porto Rico* held that the Constitutional right to a jury trial in criminal cases did not apply to U.S. citizens living in Puerto Rico.  258 U.S. 298, 309 (1922) (finding that "[t]he citizen of the United States living in Porto Rico [sic] cannot there enjoy a right of trial by jury under the federal Constitution…" and characterizing Puerto Rico as being among "these distant ocean communities of a different origin and language from those of our continental people").  The Insular Cases continue to be used to justify discriminatory treatment of U.S. Citizens living in the COLA areas of Puerto Rico, Guam, and the Northern Mariana Islands;

C.    The U.S.'s immigration policies in the 1940s and 1950s, which the President's Commission on Immigration and Naturalization deemed discriminatory and racist, noting specifically the strong effects the law would have on the people of the Caribbean due to the "predominantly

Negro population" there and the particularly limited quotas for those of "Oriental" origin and for the colonies of the Western Hemisphere;

D.    The awarding of Puerto Rican families fewer benefits under the Aid to Families with Dependent Children program, upheld in 1980;

E.    The awarding of fewer benefits to Puerto Rican residents under the Supplemental Security Income program for elderly, blind and handicapped persons and under the Medicaid program; and

F.    "Project Chariot," a plan in 1958 by the U.S. Atomic Energy Commission to detonate nuclear devices in Alaska in order to study the impacts of a nuclear fallout on the indigenous communities.

75.    The Agency's exclusionary rule necessarily impacts protected minorities to a far greater extent than non-minorities.  Given the nature of the rule, and the population of the COLA areas and the makeup of the federal workforce in those areas, the rule could have had no other effect.

A.    As of 2011, approximately 33% of the federal workforce was comprised of individuals who are members of protected minority classes.

B.    As of 2011, approximately 61% of the federal workforce in the COLA areas was comprised of individuals who are members of protected minority classes.

C.    As of 2011, approximately 90% of the federal workforce in the COLA areas other than Alaska and Hawaii was comprised of individuals who are members of one or more protected minority groups.

D.    Upon information and belief, in 1948, when the Agency first adopted its

exclusionary rule, the federal workforce in the COLA areas was also predominately comprised of individuals who were members of minority classes.  Moreover, the reasonable expectation was that, as the government continued the process of winding down from the world war, and employees from the contiguous United States who were stationed in the territories returned home, the composition of the federal workforce in the COLA areas would continue to become more heavily minority, as the native employees stayed while the non-white employees returned home.

E.      While the exclusionary rule purports to be an across-the-board exclusion, in fact, its negative impact is felt, and could only be felt, by employees in the areas where non-foreign COLA is paid, *i.e.*, in the non-foreign areas, where the majority of the employees are members of minority classes.

F.      The negative impact is further disproportionately borne by members of minority groups in the COLA areas because it is those employees, from protected minority classes, who are most likely to remain in the COLA areas, with their higher cost-of-living, than employees from the contiguous United States who may be temporarily stationed in a COLA area.  Thus, it is precisely the minority employees who are most likely to both retire and remain in a high-cost-of-living COLA area and suffer a dramatic decline in their standard of living upon retirement because their retirement annuities artificially exclude a significant portion of their pay, which was required to offset the higher living costs.

76.      For over half a century after the 1948 adoption of the exclusionary rule, the

Defendants did not offer any rationale for it and, even thereafter, have not done so except to offer untrue and pretextual *post hoc* excuses in lobbying efforts and litigation.

A.   OPM's predecessor, the CSC, issued an interpretive regulation on December 30, 1948, to be effective two days later, on January 1, 1949, which provides:

> Neither a territorial post differential nor a territorial cost-of-living allowance shall be included in the base used in computing overtime pay, night differential, holiday pay, retirement deductions, or any other additional compensation, allowance, or pay differential.

13 Fed. Reg. 8725, 8727.  The Agency offered no explanation for why it reached this result. It did not give notice or opportunity for comment in adopting this interpretive regulation.

B.   Nor has the Agency offered any explanation for its decision in any subsequent rulemaking.

C.   In 2002, OPM adopted rule changes concerning the methodology for calculating COLA payments in non-foreign areas (not related to their inclusion or exclusion from the base) to effectuate a settlement of litigation over the amount of COLA payments.  *See* Cost-of-Living Allowances (Non-foreign Areas), 67 Fed. Reg. 22339 (May 3, 2002). Responding to comments, OPM stated that it was "aware that COLAs are not included in Federal retirement calculations."  *Id.* at 22340.  OPM opined that "[i]t would take changes in the law to … include COLAs in base pay for Federal retirement purposes…" and that "[t]herefore, these issues are outside the scope of these regulations."  *Id.*  Thus, while OPM

stated that "the law" requires exclusion, it did not explain why it believed that to be so.  Moreover, it disclaimed any intent to regulate on the issue because it claimed to be bound by "the law."  *Id.*

D.   The only rationales OPM has offered for its decision to exclude COLA from the retirement base have been made in the context of lobbying for legislation and in litigation.

E.   In 2007, OPM prepared and disseminated a "Question and Answer" document which was part of a presentation it gave at various field hearings and field meetings with federal employees and others, in which it provided to various legislators, in an attempt to generate support for certain legislation then pending or contemplated.  In that context, OPM opined that 5 U.S.C. § 8331(3) "expressly excludes allowances from its definition of basic pay."

F.   Upon information and belief, OPM has never expressed any other rationale other than the various positions it has taken in litigation on the topic.

G.   In 2008, OPM discussed the COLA program, and OPM's exclusionary rule, in a brief which it filed with the United States Court of Appeals for the Ninth Circuit, in *Matsuo v United States of America*, No. 08-15553. (9th Cir. November 13, 2009).  OPM suggested that COLA is excluded from the retirement base because it is not subject to federal income tax. *See* Appellees' Brief (Nov. 8, 2008), p. 2 ("COLA benefits are not subject to federal income tax, nor or they included in the calculation of the

employees' retirement benefits"); *see also, id* at 4.  The government also cited 5 U.S.C. § 8331(3), defining "basic pay," as justification for COLA's exclusion from the retirement base.  *Id.*  It offered no further explanation.

H.   In the same brief, the government informed the Court that President Truman had established the COLA program in 1948, with Congress codifying the practice in 1966.  *Id.* at 3–4.  OPM was apparently unaware, or chose to not inform the Court, that Congress had legislated on this topic back in 1948.

I.   OPM's misrepresentation in this regard is significant, because OPM has, at times, cited the statutory description of COLA as an "allowance" as justification for the Agency's exclusionary rule.  However, prior to the 1966 recodification, which was expressly non-substantive, Congress had not called non-foreign area COLA an "allowance."

J.   Nonetheless, OPM continued to rely on the presence of the word "allowance" in the statute, notwithstanding that it was inserted only by a non-substantive recodification.  In *Cruz v. United States,* this same class sued for the same relief sought here.  No. 09-cv-79-RLF-GWC (D.V.I. October 15, 2009), ECF No. 1.  In moving to dismiss, OPM justified its exclusionary rule as follows: 5 U.S.C. § 8331(3)(H) excludes "allowances" and Congress called these payments an "allowance" in § 5941.  *See Cruz*, Defendants' Motion to Dismiss Second Amended Class Action Complaint, pp. 5–6.  Thus, OPM claimed a "statutory mandate" to exclude COLA.  *Id.*

- 32 -

K.   In this case, in its motion to dismiss (Doc. 53), OPM has offered various litigation rationales, including suggesting that COLA's non taxability also justified its exclusion from the retirement base and that it is called an "allowance." *See generally*, Doc. 53-1).

77.   All of the rationales which the Agency has offered for its decision are after-the-fact justifications, primarily consisting of litigation positions, and none of them are entitled to deference.  Each of them is a pretext.  Each of them is demonstrably wrong.  The following facts demonstrate that any explanation which OPM has given, or may give hereafter, to justify its decision to exclude COLA from the retirement base is false and pretextual:

A.   The statement that it is excluded from income and therefore excluded from retirement base is a non-sequitur.  OPM has never cited any statute, case, or other authority for the proposition that pay components which are excludable from federal income tax are, therefore, excluded from retirement base.

B.   In fact, OPM's own 1948 interpretive regulation demonstrates that OPM does not and cannot believe that whether or not a component of pay for federal employees is included in or excluded from retirement base hinges upon whether or not it is included in or excluded from gross income for purposes of federal income taxation.  In the same regulation in which it declared that neither territorial post differentials nor territorial COLA was included in retirement base, the Agency declared, two subsections later, that both post differentials and COLA were "properly includable in the gross income of the recipient for Federal Income Tax purposes."  Thus,

- 33 -

OPM's suggestion that COLA's exclusion from gross income renders it excludable from the retirement base ignores the Agency's original regulation by which the CSC announced that COLA was taxable yet still excluded from the retirement base. If OPM sincerely believed that that COLA's inclusion in or exclusion from the retirement base depends upon whether it is included in or excluded from gross income for purposes of federal income taxation, then once OPM realized that COLA is, in fact, excluded from gross income for purposes of federal income taxation, it should have also reversed its position as to its exclusion of COLA from the retirement base.  OPM did not do so, indicating that it realizes that the one has nothing to do with the other.   OPM's pronouncements in this regard are pretextual.

C.    The pretextual nature of this excuse is further demonstrated by the fact that territorial post-differentials, created by the same legislation and implemented by the same executive order as COLA, is taxable, but is still excluded from the retirement base. OPM is aware of this, and its continued suggestion that COLA exclusion from federal income justifies exclusion from the retirement base is a pretext.

D.    In fact, the exclusion of COLA from gross income for purposes of federal income taxation represents a congressional policy choice to exempt COLA from taxation in order to avoid having to increase the amount of the allowance to properly compensate federate employees stationed outside the continental United States.  *See* 26 U.S.C. § 912(2) (excluding COLA

from gross income); Sen. Rep. No. 627 (1943), at 992, 1014; *Sjoroos v. Commissioner of Internal Revenue*, 81 T.C. No. 61 (1983) (exclusion of COLA from federal income "reflects a policy decision by congress as to how Federal employees should be recompensed for the added living costs they incurred while assigned to certain locations, i. e., by tax exemption of the cost-of-living allowances rather than by an increase in the amounts thereof"); *accord Lyman v. Commissioner of Internal Revenue*, T.C. Memo 1984-115 (1984).

E.      The exclusion of COLA from federal income has nothing to do with whether or not it is included in the retirement base.  In fact, because COLA is set lower than it otherwise would be—to save the government money because it does not have to "gross-up" the COLA payments to offset the higher costs of living—even COLA's inclusion in the retirement base will not achieve parity for the plaintiffs.  Other federal employees get the full measure of their regular compensation, including the portion with which they pay taxes, counted toward their "High-3."  Plaintiffs, however, would not get that full credit, even if COLA were included in their retirement base because the amount of the COLA is discounted.

F.      OPM's repeated suggestions that COLA's tax-free nature justifies exclusion from the retirement base is a pretext.

G.      Likewise, OPM's reliance on the statutory use of the word "allowance" can be nothing but a pretext.

H.      The Agency's justification, in 2007 and thereafter, that it must exclude

COLA from the retirement base because Congress called it an "allowance" is an obvious pretext.  OPM's predecessor, CSC, made the decision in 1948 to publish its interpretive regulation excluding COLA from the retirement base.  However, Congress did not refer to non-foreign area salary differentials, which are now called COLA, as an "allowance" in 1948, or at any time until a "non-substantive" recodification in 1966.  Instead, in 1948, Congress simply called it "additional compensation," even while calling similar payments to employees in foreign countries a "cost of living allowance," indicating an intent to distinguish between the two.

I.      The first appearance in the statute of the term "allowance," to refer to what is now called non-foreign area COLA, occurred in 1966 in a recodification in which Congress expressly states was intended to effect no substantive change.

J.      In fact, when Congress legislated in 1948, there was a long and well-established practice of including such payments, called salary differentials, in base pay.  Nothing about the 1948 legislation, or the non-substantive 1966 recodification, hints at any desire by Congress to change that well-established practice.

K.      The Agency's attempt to justify its 1948 exclusionary rule by claiming reliance upon Congress' use of the word "allowance," which did not even occur until 1966 and, even then, was non-substantive, is an obvious pretext.

L.      OPM is well-aware that the word "allowance" was not inserted into the statue until 1966 to refer to non-foreign COLA, and that, even then, it was inserted by a non-substantive recodification. Nonetheless, OPM continues, including in this case, to assert that as a reason for its 1948 decision. That is a pretext.

M.      Additionally, OPM's rationalization that the definition of "basic pay" in the Civil Service Retirement Act of 1920, Pub. L. No. 66-215, 41 Stat. 614, ch. 195 (1920) ("CSRA") excludes everything which is called an allowance, as justification for its 1948 decision, is wrong, and a pretext.

N.      The CSRA did not attempt to define the term "basic salary, pay, or compensation."  Instead:

>       The term "basic salary, pay, or compensation" wherever used in this Act shall be so construed as to exclude from the operation of the Act all bonuses, allowances, overtime pay, or salary, pay, or compensation given in addition to the base pay of the positions as fixed by law or regulation.

*Id*.  Notwithstanding that 1920 statute, as of 1948 when the Agency adopted its exclusionary rule, it was a well-established practice of federal agencies, including the CSC, to pay a salary differential, now called COLA, and to include it in the retirement base because it was part of the "base pay."

O.      Moreover, the inquiry was not, and is not, whether something is merely labeled "allowance," but whether it is, in fact, an addition to "the base pay of the positions as fixed by law or regulation."

P.      In fact, pay which occurs on a regularly recurring basis throughout an

- 37 -

employee's service, such that it assumes a career pattern, logically should be included as part of base pay for purposes of the employee's retirement base, in order to more realistically relate retirement annuities and related benefits to the employee's usual income.

Q.   OPM has never explained why it acted directly contrary to § 208(b) of Executive Order 10,000, in which President Truman, having discussed both territorial post-differential and territorial cost-of-living allowances, specifically excluded only post-differentials from the retirement base.

78.   The Agency's *post hoc* excuses for its 1948 exclusionary rule are all false and pretextual.

79.   The Agency's exclusionary rule was, instead, intended to be discriminatory in nature, was based on racial stereotypes, and intended to have, and did and does have, an adverse disparate impact on racial and ethnic minorities.  This discrimination is not the unavoidable consequence of a rule aimed at a worthy goal; it is the intended consequence of a rule that has no justification whatsoever.

80.   Accordingly, the ongoing and repeated practices of Defendants in excluding COLA from the retirement base constitute ongoing and repeated violations of 42 U.S.C. § 2000e-16, with a new violation occurring with each annuity payment that is based on this incorrect calculation.  In addition, these practices are the result of other actions by the Agency, each of which also violates 42 U.S.C. § 2000e-16.

81.   From the public statements of OPM, it is clear that in excluding COLA from the retirement base the Agency relied solely on current editions of the United States Code in which, since 1966, COLA is called an allowance, disregarding any and all evidence of the original and

continuing intent of Congress and the President, and disregarding the fact that the 1966 change in terminology was made by a clerical code reviser without substantive effect, as explained by the Congressional committees in charge of the re-codification process.  Thus, the Agency's practice of excluding COLA from the retirement base, in addition to being an unlawful rule itself, is also the result of a separate and implicit rule to the effect that any pay component—such as COLA—that happens to be called an allowance in a current edition of the United States Code is thereby excluded from the retirement base.  This underlying rule, which is not based on location in any way, has a disparate adverse impact on racial and ethnic minorities in violation of 42 U.S.C. § 2000e-16.

82.    Moreover, the Agency has never fulfilled its statutory responsibility to issue regulations giving effect to the term "basic salary, pay, or compensation" or the term "base pay of the position" as used in the Civil Service Retirement Act of 1920, as amended.  The duty to issue regulations has been explicit in the retirement statutes from their inception.  Yet the Agency has never conducted any proceeding for the purpose of explaining or defining the statutory terms, nor has it ever offered a substantive or policy reason for excluding COLA from the scope of these terms.  In fact, the exclusion is not only extremely unfair to class members, but also counterproductive to the national interests served by the federal retirement system, as a rulemaking process including notice and opportunity for comment would have clearly revealed. The practice of excluding COLA from the retirement base is the direct result of the Agency's failure to engage in such a process and to issue regulations giving effect to the essential terms of the retirement statute.  This failure has had, and is continuing to have, a disparate adverse impact on racial and ethnic minorities.  It has left federal employees in non-foreign areas as the only class of federal employees whose regular compensation for a normal workweek is not entirely

included in the retirement base.  The Agency's ongoing failure to meet its statutory obligation to issue regulations is, like the rule described in the preceding paragraphs, not based on location in any way, and it is a separate ongoing violation of 42 U.S.C. § 2000e-16.

83.    Defendant OPM has both the power and the duty under 5 U.S.C. §§ 8347(a) and 8461(g) to end the ongoing practices immediately, and to change the regulations described above by issuing new regulations, so as to include COLA in the retirement base and prevent further harm to protected minorities and all other class members.  For the foregoing reasons, the Court should therefore declare that the exclusionary rule and related rules illegally discriminate against racial and ethnic minorities.

**The exclusion of COLA from the retirement base violates the rights of
all federal employees to receive pay of equal value for work of equal value.**

84.    Annuities received by federal retirees are an essential part of their overall compensation.  The underpayment of annuities to class members in this case violates their rights to receive pay of equal value for work of equal value, in addition to exceeding the Agency's authority and violating 42 U.S.C. § 2000e-16 and 5 U.S.C. § 2302(b). The Court should therefore declare that the exclusion of COLA from the retirement base violates the rights of all federal employees to receive equal pay for equal work.

## CLAIMS FOR SPECIFIC ENFORCEMENT

85.    Pursuant to Section 6 of the Administrative Procedure Act, 5 U.S.C. § 706, which directs the Court to "compel agency action unlawfully withheld or unreasonably delayed," and 28 U.S.C. § 1361, which provides that "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff," Plaintiffs hereby request the Court to enter an order requiring the following steps to be taken and changes to be made by Defendants

with respect to each member of the class:

      A.      Correction of all pay records and retirement accounts so as to include, as part of base pay and basic pay, all COLA payments, and thereby to increase "average pay" and the amounts of annuities payable to retirees and surviving spouses, such corrections to show the annuity amounts paid and remaining unpaid, by year;

      B.      As of an effective date after the issuance of the order, changes in benefit payment procedures to ensure that all subsequent payments of the retirement annuity and other benefits will be made in the increased amounts indicated by the corrected records and accounts; and

      C.      Payment, from the Civil Service Retirement and Disability Fund, of a lump sum equal to (i) the aggregate of all amounts by which payments of the retirement annuity and other benefits prior to the effective date were less than the amounts indicated by the corrected records and accounts, plus (ii) interest earned or saved by Defendants as a result of their retention of unpaid amounts, to the date of payment.

86.     The correction of pay records and retirement accounts pursuant to the foregoing paragraph 85(A) must include a recalculation by Defendants of the annuity originally due to each class member who retired before the effective date specified in paragraph 85(B), based on the rules for calculating annuities that were in effect on the date of retirement, and a recalculation of each periodic increase to the original amount (based on nation-wide increases in the cost-of-living).  For purposes of the restitution required by paragraph 85(C). Defendants should be ordered to cooperate with Plaintiffs in developing an appropriate formula for calculating the

interest earned or saved by Defendants as a result of their unlawful retention of the unpaid annuity amounts.

## CAUSES OF ACTION

87.     Plaintiffs incorporate paragraphs 22–23 and 46–86 of this Complaint, above, into the following Counts One, Two, and Three as if set forth in full therein.

### Count One:  Declaratory Judgment

88.     Each named Plaintiff, each member of the class, and each Defendant, is an "interested party" within the meaning of that term in 28 U.S.C. § 2201(a).

89.     An actual, genuine, and justiciable controversy exists between Plaintiffs and Defendants concerning the above mentioned matters and unlawful acts.   The controversy is appropriate for resolution pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, and Rule 57 of the Federal Rules of Civil Procedure.

90.     Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a judgment declaring their rights.   In addition, pursuant to 28 U.S.C. § 2202, Plaintiffs are entitled to further necessary or proper relief based upon the declarations of this Court.

91.     Plaintiffs request that the Court enter the declarations, findings, conclusions and judgments contained in paragraphs 46–86 above.

### Count Two:  Administrative Procedure Act

92.     Section 6 of the Administrative Procedure Act, 5 U.S.C. § 706 (the "APA"), directs the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of

procedure required by law; . . . or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."

93.     Plaintiffs have suffered and are suffering with each annuity payment a legal wrong and are adversely affected and aggrieved, as those terms are used in 5 U.S.C. § 702, by each of the Agency actions of which they complain herein.

94.     Plaintiffs are entitled, under the APA, to the declarations, findings, conclusions, orders of specific performance, and judgments contained in 46–86 above.

**Count Three:  Violations of 42 U.S.C. § 2000e-16**

95.     The federal employees who work in the non-foreign areas are disproportionately African American, Hispanic, Alaska Native, Native Hawaiian, and/or Asian.  Upon information and belief, the majority of federal employees in each non-foreign area are made up of one or two of these protected minority groups.

96.     The rule and practice of excluding COLA from base pay and basic pay is based on discriminatory intent against, racial and ethnic stereotyping of, and has a disparate and extremely adverse impact upon, protected minorities, which make up a large portion of the population of the COLA areas.  Defendants' conduct has a disproportionately negative impact on racial and ethnic minorities, as described elsewhere herein.   Defendant OPM knew and understood that its decisions would have a disparate and extremely adverse impact on members of protected minority groups and, upon information and belief, intended that discriminatory impact.

97.     There is no business or national interest that justifies the negative disparate impact of these practices and rules.

98.     Therefore, Plaintiffs are entitled to all declaratory or injunctive relief necessary to

end the discriminatory impact of the exclusionary rule, and such affirmative action as may be appropriate, including an award of equitable relief and any appropriate and recoverable damages.

### PRAYER FOR RELIEF

99.     Plaintiffs, on behalf of themselves and the class, hereby pray for the following relief:

A.     An order certifying this case as a class action;

B.     Judgment in favor of Plaintiffs and against Defendants on Counts One, Two, and Three of this Complaint;

C.     A declaration that the exclusion of COLA from "basic pay" for purposes of the retirement annuity and other benefits is unlawful and void consistent with paragraphs 46–86 herein;

D.     A permanent injunction prohibiting Defendants from excluding COLA from the retirement base of federal employees in non-foreign areas;

E.     Correction of all pay records and retirement accounts so as to include, as part of base pay and basic pay, all COLA payments, and thereby to increase "average pay" and the amounts of annuities payable to retirees and surviving spouses;

F.     Changes in benefit payment procedures to ensure that all subsequent payments of the retirement annuity and other benefits will be made in the increased amounts indicated by the corrected records and accounts;

G.     An order requiring Defendants to pay, from the Civil Service Retirement and Disability Fund, to a trustee for distribution in accordance with an order of the Court, (a) the aggregate amount by which the retirement

annuities of any and all class members have been underpaid as a result of the unlawful exclusion of COLA from the retirement base, plus (b) interest earned or saved by Defendants as a result of their retention of unpaid amounts, to the date of payment, and such other costs as may be awarded by the Court;

H.    In the alternative, an order requiring Defendants to pay, from the Civil Service Retirement and Disability Fund, to each living class member and to any lawfully entitled representative, successor, or assign of a deceased class member, (a) the aggregate amount by which the retirement annuities of the class member have been underpaid as a result of the unlawful exclusion of COLA from the retirement base, plus (b) interest earned or saved by Defendants as a result of their retention of unpaid amounts, to the date of payment, and such other amounts as may be awarded by the Court;

I.    All declaratory or injunctive relief necessary to end the discriminatory impact of the exclusionary rule described herein, and such affirmative action as may be appropriate, including an award of equitable relief and any appropriate and recoverable damages;

J.    An award of attorney's fees and costs in favor of Plaintiffs and against Defendants; and

K.    Such other relief, at law or in equity, as is deemed just and equitable by the Court.

## DEMAND FOR JURY TRIAL

100.    Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby demand a jury trial on all issues

so triable.

DATED this 17th day of September, 2014.

*s/ Raúl M. Arias*
USDC-209706
rma@mcvpr.com

MCCONNELL VALDES LLC
PO Box 364225
San Juan, Puerto Rico 00936-4225
270 Muñoz Rivera Avenue
Hato Rey, Puerto Rico  00918
Tels. (787) 250-2604
Fax: (787) 759-2772

*Attorneys for Plaintiffs*